(Slip Opinion)        OCTOBER TERM, 2012        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL TRADE COMMISSION *v.* PHOEBE PUTNEY HEALTH SYSTEM, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 11–1160.   Argued November 26, 2012—Decided February 19, 2013

Under Georgia's Hospital Authorities Law (Law), political subdivisions may create special-purpose public entities called hospital authorities to provide "for the operation and maintenance of needed health care facilities in the several counties and municipalities of th[e] state." The Law permits authorities to "exercise public and essential governmental functions" and delegates to them numerous general powers, including the ability to acquire and lease hospitals and other public health facilities. Ga. Code Ann. §31–7–75.

The Hospital Authority of Albany-Dougherty County (Authority) owns Phoebe Putney Memorial Hospital (Memorial), one of two hospitals in the county. The Authority formed two private nonprofit corporations to manage Memorial: Phoebe Putney Health System, Inc. (PPHS) and Phoebe Putney Memorial Hospital, Inc. (PPMH). After the Authority decided to purchase the second hospital in the county and lease it to a subsidiary of PPHS, the Federal Trade Commission (FTC) issued an administrative complaint alleging that the transaction would substantially reduce competition in the market for acute-care hospital services, in violation of §5 of the Federal Trade Commission Act and §7 of the Clayton Act. The FTC and Georgia subsequently sued the Authority, PPHS, PPMH, and others (collectively respondents), seeking to enjoin the transaction pending administrative proceedings. The District Court denied the request for a preliminary injunction and granted respondents' motion to dismiss, holding that respondents are immune from antitrust liability under the state-action doctrine. The Eleventh Circuit affirmed. It concluded that the Authority, as a local governmental entity, was entitled to state-action immunity because the challenged anticompetitive conduct was a fore-

seeable result of the Law.  The court reasoned that the state legislature could have readily anticipated an anticompetitive effect, given the breadth of the powers delegated to hospital authorities, particularly leasing and acquisition powers that could lead to consolidation of hospital ownership.

*Held*: Because Georgia has not clearly articulated and affirmatively expressed a policy allowing hospital authorities to make acquisitions that substantially lessen competition, state-action immunity does not apply.  Pp. 6–19.

 (a) This Court recognized in *Parker* v. *Brown*, 317 U. S. 341, 350–352, that the federal antitrust laws do not prevent States from imposing market restraints "as an act of government . . . ."  Under the state-action doctrine, immunity from federal antitrust law may extend to nonstate actors carrying out the State's regulatory program.  See, *e.g., Patrick* v. *Burget*, 486 U. S. 94, 99–100.  But given the antitrust laws' values of free enterprise and economic competition, "state-action immunity is disfavored," *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 636, and is recognized only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to the "State's own" regulatory scheme, *id.,* at 635.  Immunity will attach only to activities of substate governmental entities that are undertaken pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition.  *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 52.  A state legislature need not "expressly state" that intent, *Hallie* v. *Eau Claire*, 471 U. S. 34, 43, but the anticompetitive effect must have been the "foreseeable result" of what the State authorized, *id.,* at 42.  Pp. 6–9.

 (b) Respondents' state-action immunity defense fails under the clear-articulation test because there is no evidence the State affirmatively contemplated that hospital authorities would displace competition by consolidating hospital ownership.  The Authority's powers, including its acquisition and leasing powers, mirror general powers routinely conferred by state law on private corporations.  More is required to establish state-action immunity; the Authority must show that it has been delegated authority not just to act, but to act or regulate anticompetitively.  *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U. S. 365, 372.  In *Boulder*, this Court concluded that a Colorado law granting municipalities the power to enact ordinances governing local affairs did not satisfy the clear-articulation test, 455 U. S., at 55–56, because, when a State's position "is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive," the State cannot be said to have " 'contemplated' " those anticompetitive actions, *id.,* at 55.

 That principle controls here.  Grants of general corporate power al-

Syllabus

lowing substate governmental entities to participate in a competitive marketplace are typically used without raising federal antitrust concerns, so a State cannot be said to have contemplated that such powers will be used anticompetitively. Here, though the Law allows the Authority to acquire hospitals, it does not clearly articulate and affirmatively express a state policy empowering the Authority to make acquisitions of existing hospitals that will substantially lessen competition. Pp. 9–10.

(c) In concluding otherwise, the Eleventh Circuit applied the concept of "foreseeability" too loosely. This Court, recognizing that no legislature "can be expected to catalog all of the anticipated effects" of a statute delegating authority to a substate governmental entity, *Hallie,* 471 U. S., at 43, has approached the clear-articulation inquiry practically, but without diluting the ultimate requirement that the State must have affirmatively contemplated the displacement of competition such that the challenged anticompetitive effects can be attributed to the "state itself," *Parker*, 317 U. S., at 352. Thus, the Court has found a state policy to displace federal antitrust law was sufficiently expressed where the displacement of competition was the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals. See *Hallie,* 471 U. S., at 41; *Omni,* 499 U. S., at 373. By contrast, when a State grants an entity a general power to act, it does so against the backdrop of federal antitrust law. Entities might transgress antitrust requirements by exercising their powers anticompetitively, but a reasonable legislature's ability to anticipate that possibility falls well short of clearly articulating an affirmative state policy to displace competition. The Eleventh Circuit's argument, echoed by respondents, that the case falls within the foreseeability standard used in *Hallie* and *Omni* is rejected. Pp. 11–14.

(d) Respondents' additional arguments are also unpersuasive. They contend that because hospital authorities are granted unique powers and responsibilities to fulfill Georgia's objective of providing access to adequate and affordable health care, it was foreseeable that they would decide that the best way to serve their communities was to acquire an existing local hospital, instead of incurring the additional expense and regulatory burden of expanding, or constructing, a facility. But even though the authorities may differ from private corporations offering hospital services, neither the Law nor any other state-law provision clearly articulates a state policy allowing authorities to exercise their general corporate powers without regard to anticompetitive effects. Respondents also contend that when there is doubt about whether the clear-articulation test is satisfied, federal

Syllabus

courts should err on the side of recognizing immunity to avoid im-proper interference with state policy choices.  But the Law here is not ambiguous, and respondents' suggestion is inconsistent with the principle that "state-action immunity is disfavored," *Ticor Title*, 504 U. S., at 636.  Pp. 14–19.

663 F. 3d 1369, reversed and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 11–1160

## FEDERAL TRADE COMMISSION, PETITIONER *v.* PHOEBE PUTNEY HEALTH SYSTEM, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

### [February 19, 2013]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Under this Court's state-action immunity doctrine, when a local governmental entity acts pursuant to a clearly articulated and affirmatively expressed state policy to displace competition, it is exempt from scrutiny under the federal antitrust laws. In this case, we must decide whether a Georgia law that creates special-purpose public entities called hospital authorities and gives those entities general corporate powers, including the power to acquire hospitals, clearly articulates and affirmatively expresses a state policy to permit acquisitions that substantially lessen competition. Because Georgia's grant of general corporate powers to hospital authorities does not include permission to use those powers anticompetitively, we hold that the clear-articulation test is not satisfied and state-action immunity does not apply.

## I

### A

In 1941, the State of Georgia amended its Constitution to allow political subdivisions to provide health care ser-

vices. 1941 Ga. Laws p. 50. The State concurrently enacted the Hospital Authorities Law (Law), *id.*, at 241, Ga. Code Ann. §31–7–70 *et seq.* (2012), "to provide a mechanism for the operation and maintenance of needed health care facilities in the several counties and municipalities of th[e] state." §31–7–76(a). "The purpose of the constitutional provision and the statute based thereon was to . . . create an organization which could carry out and make more workable the duty which the State owed to its indigent sick." *DeJarnette* v. *Hospital Auth. of Albany*, 195 Ga. 189, 200, 23 S. E. 2d 716, 723 (1942) (citations omitted). As amended, the Law authorizes each county and municipality, and certain combinations of counties or municipalities, to create "a public body corporate and politic" called a "hospital authority." §§31–7–72(a), (d). Hospital authorities are governed by 5- to 9-member boards that are appointed by the governing body of the county or municipality in their area of operation. §31–7–72(a).

Under the Law, a hospital authority "exercise[s] public and essential governmental functions" and is delegated "all the powers necessary or convenient to carry out and effectuate" the Law's purposes. §31–7–75. Giving more content to that general delegation, the Law enumerates 27 powers conferred upon hospital authorities, including the power "[t]o acquire by purchase, lease, or otherwise and to operate projects," §31–7–75(4), which are defined to include hospitals and other public health facilities, §31–7–71(5); "[t]o construct, reconstruct, improve, alter, and repair projects," §31–7–75(5); "[t]o lease . . . for operation by others any project" provided certain conditions are satisfied, §31–7–75(7); and "[t]o establish rates and charges for the services and use of the facilities of the authority," §31–7–75(10). Hospital authorities may not operate or construct any project for profit, and accordingly they must set rates so as only to cover operating expenses and create

reasonable reserves. §31–7–77.

## B

In the same year that the Law was adopted, the city of Albany and Dougherty County established the Hospital Authority of Albany-Dougherty County (Authority) and the Authority promptly acquired Phoebe Putney Memorial Hospital (Memorial), which has been in operation in Albany since 1911. In 1990, the Authority restructured its operations by forming two private nonprofit corporations to manage Memorial: Phoebe Putney Health System, Inc. (PPHS), and its subsidiary, Phoebe Putney Memorial Hospital, Inc. (PPMH). The Authority leased Memorial to PPMH for $1 per year for 40 years. Under the lease, PPMH has exclusive authority over the operation of Memorial, including the ability to set rates for services. Consistent with §31–7–75(7), PPMH is subject to lease conditions that require provision of care to the indigent sick and limit its rate of return.

Memorial is one of two hospitals in Dougherty County. The second, Palmyra Medical Center (Palmyra), was established in Albany in 1971 and is located just two miles from Memorial. At the time suit was brought in this case, Palmyra was operated by a national for-profit hospital network, HCA, Inc. (HCA). Together, Memorial and Palmyra account for 86 percent of the market for acute-care hospital services provided to commercial health care plans and their customers in the six counties surrounding Albany. Memorial accounts for 75 percent of that market on its own.

In 2010, PPHS began discussions with HCA about acquiring Palmyra. Following negotiations, PPHS presented the Authority with a plan under which the Authority would purchase Palmyra with PPHS controlled funds and then lease Palmyra to a PPHS subsidiary for $1 per year under the Memorial lease agreement. The Authority

unanimously approved the transaction.

The Federal Trade Commission (FTC) shortly there-
after issued an administrative complaint alleging that the
proposed purchase-and-lease transaction would create a
virtual monopoly and would substantially reduce competi-
tion in the market for acute-care hospital services, in
violation of §5 of the Federal Trade Commission Act, 38
Stat. 719, 15 U. S. C. §45, and §7 of the Clayton Act, 38
Stat. 731, 15 U. S. C. §18. The FTC, along with the State
of Georgia,[1] subsequently filed suit against the Authority,
HCA, Palmyra, PPHS, PPMH, and the new PPHS subsid-
iary created to manage Palmyra (collectively respondents),
seeking to enjoin the transaction pending administrative
proceedings. See 15 U. S. C. §§26, 53(b).

The United States District Court for the Middle District
of Georgia denied the request for a preliminary injunction
and granted respondents' motion to dismiss. 793 F. Supp.
2d 1356 (2011). The District Court held that respondents
are immune from antitrust liability under the state-action
doctrine. See *id.,* at 1366–1381.

The United States Court of Appeals for the Eleventh
Circuit affirmed. 663 F. 3d 1369 (2011). As an initial
matter, the court "agree[d] with the [FTC] that, on the
facts alleged, the joint operation of Memorial and Palmyra
would substantially lessen competition or tend to create,
if not create, a monopoly." *Id.,* at 1375. But the court con-
cluded that the transaction was immune from antitrust
liability. See *id.,* at 1375–1378. The Court of Appeals
explained that as a local governmental entity, the Author-
ity was entitled to state-action immunity if the challenged
anticompetitive conduct was a "'foreseeable result'" of
Georgia's legislation. *Id.,* at 1375. According to the court,
anticompetitive conduct is foreseeable if it could have been

―――――――

[1] Georgia did not join the notice of appeal filed by the FTC and is no
longer a party in the case.

"'reasonably anticipated'" by the state legislature; it is not necessary, the court reasoned, for an anticompetitive effect to "be 'one that ordinarily occurs, routinely occurs, or is inherently likely to occur as a result of the empowering legislation.'" *Id.,* at 1375–1376 (quoting *FTC* v. *Hospital Bd. of Directors of Lee Cty.*, 38 F. 3d 1184, 1188, 1190–1191 (CA11 1994)). Applying that standard, the Court of Appeals concluded that the Law contemplated the anticompetitive conduct challenged by the FTC. The court noted the "impressive breadth" of the powers given to hospital authorities, which include traditional powers of private corporations and a few additional capabilities, such as the power to exercise eminent domain. See 663 F. 3d, at 1376. More specifically, the court reasoned that the Georgia Legislature must have anticipated that the grant of power to hospital authorities to acquire and lease projects would produce anticompetitive effects because "[f]oreseeably, acquisitions could consolidate ownership of competing hospitals, eliminating competition between them." *Id.,* at 1377.[2]

The Court of Appeals also rejected the FTC's alternative argument that state-action immunity did not apply because the transaction in substance involved a transfer of control over Palmyra from one private entity to another, with the Authority acting as a mere conduit for the sale to evade antitrust liability. See *id.,* at 1376, n. 12.

We granted certiorari on two questions: whether the

---

[2] In tension with the Court of Appeals' decision, other Circuits have held in analogous circumstances that substate governmental entities exercising general corporate powers were not entitled to state-action immunity. See *Kay Elec. Cooperative* v. *Newkirk,* 647 F. 3d 1039, 1043, 1045–1047 (CA10 2011); *First Am. Title Co.* v. *Devaugh*, 480 F. 3d 438, 456–457 (CA6 2007); *Surgical Care Center of Hammond, L. C.* v. *Hospital Serv. Dist. No. 1*, 171 F. 3d 231, 235–236 (CA5 1999) (en banc); *Lancaster Community Hospital* v. *Antelope Valley Hospital Dist.*, 940 F. 2d 397, 402–403 (CA9 1991).

Georgia Legislature, through the powers it vested in hospital authorities, clearly articulated and affirmatively expressed a state policy to displace competition in the market for hospital services; and if so, whether state-action immunity is nonetheless inapplicable as a result of the Authority's minimal participation in negotiating the terms of the sale of Palymra and the Authority's limited supervision of the two hospitals' operations. See 567 U. S. ___ (2012). Concluding that the answer to the first question is "no," we reverse without reaching the second question.[3]

II

In *Parker* v. *Brown*, 317 U. S. 341 (1943), this Court held that because "nothing in the language of the Sherman Act [15 U. S. C. §1 *et seq.*] or in its history" suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies, the Act should not be read to bar States from imposing market restraints "as an act of government." *Id.,* at 350, 352. Following *Parker*, we have held that under certain circumstances, immunity from the federal antitrust laws may extend to nonstate actors carrying out the State's regulatory program. See *Patrick* v. *Burget*, 486 U. S. 94, 99–100 (1988); *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 56–57 (1985).

———————

[3] After issuing its decision, the Court of Appeals dissolved the temporary injunction that it had granted pending appeal and the transaction closed. The case is not moot, however, because the District Court on remand could enjoin respondents from taking actions that would disturb the status quo and impede a final remedial decree. See *Knox* v. *Service Employees*, 567 U. S. ___, ___ (2012) (slip op., at 7) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (internal quotation marks omitted)); see also *FTC* v. *Whole Foods Market, Inc.*, 548 F. 3d 1028, 1033–1034 (CADC 2008) (opinion of Brown, J.) (rejecting a mootness argument in a similar posture).

But given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, "state-action immunity is disfavored, much as are repeals by implication." *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 636 (1992). Consistent with this preference, we recognize state-action immunity only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that "is the State's own." *Id.,* at 635. Accordingly, "[c]loser analysis is required when the activity at issue is not directly that of" the State itself, but rather "is carried out by others pursuant to state authorization." *Hoover* v. *Ronwin*, 466 U. S. 558, 568 (1984). When determining whether the anticompetitive acts of private parties are entitled to immunity, we employ a two-part test, requiring first that "the challenged restraint . . . be one clearly articulated and affirmatively expressed as state policy," and second that "the policy . . . be actively supervised by the State." *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 105 (1980) (internal quotation marks omitted).

This case involves allegedly anticompetitive conduct undertaken by a substate governmental entity. Because municipalities and other political subdivisions are not themselves sovereign, state-action immunity under *Parker* does not apply to them directly. See *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U. S. 365, 370 (1991); *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 411–413 (1978) (plurality opinion). At the same time, however, substate governmental entities do receive immunity from antitrust scrutiny when they act "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.*, at 413.[4] This rule "preserves to the States

_____

[4] An *amicus curiae* contends that we should recognize and apply a "market participant" exception to state-action immunity because

their freedom . . . to use their municipalities to administer state regulatory policies free of the inhibitions of the federal antitrust laws without at the same time permitting purely parochial interests to disrupt the Nation's free-market goals." *Id.*, at 415–416.

As with private parties, immunity will only attach to the activities of local governmental entities if they are undertaken pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition. *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 52 (1982). But unlike private parties, such entities are not subject to the "active state supervision requirement" because they have less of an incentive to pursue their own self-interest under the guise of implementing state policies. *Hallie* v. *Eau Claire*, 471 U. S. 34, 46–47 (1985).[5]

"[T]o pass the 'clear articulation' test," a state legislature need not "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Id.,* at 43. Rather, we explained in *Hallie* that state-action immunity applies if the anticompetitive effect was the "foreseeable result" of what the State authorized. *Id.*, at 42. We applied that

----

Georgia's hospital authorities engage in proprietary activities. Brief for National Federation of Independent Business 6–24; see also *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U. S. 365, 374–375, 379 (1991) (leaving open the possibility of a market participant exception). Because this argument was not raised by the parties or passed on by the lower courts, we do not consider it. *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 60, n. 2 (1981).

[5] The Eleventh Circuit has held that while Georgia's hospital authorities are "unique entities" that lie "somewhere between a local, general-purpose governing body (such as a city or county) and a corporation," they qualify as "an instrumentality, agency, or 'political subdivision' of Georgia for purposes of state action immunity." *Crosby* v. *Hospital Auth. of Valdosta & Lowndes Cty.*, 93 F. 3d 1515, 1524–1526 (1996). The FTC has not challenged that characterization of Georgia's hospital authorities, and we accordingly operate from the assumption that hospital authorities are akin to political subdivisions.

principle in *Omni*, where we concluded that the clear-articulation test was satisfied because the suppression of competition in the billboard market was the foreseeable result of a state statute authorizing municipalities to adopt zoning ordinances regulating the construction of buildings and other structures. 499 U. S., at 373.

## III
## A

Applying the clear-articulation test to the Law before us, we conclude that respondents' claim for state-action immunity fails because there is no evidence the State affirmatively contemplated that hospital authorities would displace competition by consolidating hospital ownership. The acquisition and leasing powers exercised by the Authority in the challenged transaction, which were the principal powers relied upon by the Court of Appeals in finding state-action immunity, see 663 F. 3d, at 1377, mirror general powers routinely conferred by state law upon private corporations.[6] Other powers possessed by hospital authorities that the Court of Appeals characterized as having "impressive breadth," *id.*, at 1376, also fit this pattern, including the ability to make and execute contracts, §31–7–75(3), to set rates for services, §31–7–75(10), to sue and be sued, §31–7–75(1), to borrow money, §31–7–75(17), and the residual authority to exercise any or all powers possessed by private corporations, §31–7–75(21).

Our case law makes clear that state-law authority to act is insufficient to establish state-action immunity; the

_____

[6] Compare Ga. Code Ann. §§31–7–75(4), (7) (2012) (authorizing hospital authorities to acquire projects and enter lease agreements), with §14–2–302 (outlining general powers of private corporations in Georgia, which include the ability to acquire and lease property), §14–2–1101 (allowing corporate mergers), and §§14–2–1201, 14–2–1202 (allowing sales of corporate assets to other corporations).

substate governmental entity must also show that it has been delegated authority to act or regulate anticompetitively. See *Omni*, 499 U. S., at 372. In *Boulder*, we held that Colorado's Home Rule Amendment allowing municipalities to govern local affairs did not satisfy the clear-articulation test. 455 U. S., at 55–56. There was no doubt in that case that the city had authority as a matter of state law to pass an ordinance imposing a moratorium on a cable provider's expansion of service. *Id.,* at 45–46. But we rejected the proposition that "the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances" because such an approach "would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." *Id.,* at 56. We explained that when a State's position "is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive," the State cannot be said to have "'contemplated'" those anticompetitive actions. *Id.,* at 55.

The principle articulated in *Boulder* controls this case. Grants of general corporate power that allow substate governmental entities to participate in a competitive marketplace should be, can be, and typically are used in ways that raise no federal antitrust concerns. As a result, a State that has delegated such general powers "can hardly be said to have 'contemplated'" that they will be used anticompetitively. *Ibid.* See also 1A P. Areeda & H. Hovenkamp, Antitrust Law ¶225a, p. 131 (3d ed. 2006) (hereinafter Areeda & Hovenkamp) ("When a state grants power to an inferior entity, it presumably grants the power to do the thing contemplated, but not to do so anticompetitively"). Thus, while the Law does allow the Authority to acquire hospitals, it does not clearly articulate and affirmatively express a state policy empowering the Authority to make acquisitions of existing hospitals that will substantially lessen competition.

B

In concluding otherwise, and specifically in reasoning that the Georgia Legislature "must have anticipated" that acquisitions by hospital authorities "would produce anticompetitive effects," 663 F. 3d, at 1377, the Court of Appeals applied the concept of "foreseeability" from our clear-articulation test too loosely.

In *Hallie*, we recognized that it would "embod[y] an unrealistic view of how legislatures work and of how statutes are written" to require state legislatures to explicitly authorize specific anticompetitive effects before state-action immunity could apply. 471 U. S., at 43. "No legislature," we explained, "can be expected to catalog all of the anticipated effects" of a statute delegating authority to a substate governmental entity. *Ibid.* Instead, we have approached the clear-articulation inquiry more practically, but without diluting the ultimate requirement that the State must have affirmatively contemplated the displacement of competition such that the challenged anticompetitive effects can be attributed to the "state itself." *Parker*, 317 U. S., at 352. Thus, we have concluded that a state policy to displace federal antitrust law was sufficiently expressed where the displacement of competition was the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals.

For example, in *Hallie*, Wisconsin statutory law regulating the municipal provision of sewage services expressly permitted cities to limit their service to surrounding unincorporated areas. See 471 U. S., at 41. While unincorporated towns alleged that the city's exercise of that power constituted an unlawful tying arrangement, an unlawful refusal to deal, and an abuse of monopoly power, we had no trouble concluding that these alleged anticompetitive

effects were affirmatively contemplated by the State be-cause it was "clear" that they "logically would result" from the grant of authority. *Id.*, at 42. As described by the Wisconsin Supreme Court, the state legislature "'viewed annexation by the city of a surrounding unincorporated area as a reasonable *quid pro quo* that a city could require before extending sewer services to the area.'" *Id.*, at 44–45, n. 8 (quoting *Hallie* v. *Chippewa Falls*, 105 Wis. 2d 533, 540–541, 314 N. W. 2d 321, 325 (1982)). Without immunity, federal antitrust law could have undermined that arrangement and taken completely off the table the policy option that the State clearly intended for cities to have.

Similarly, in *Omni*, where the respondents alleged that the city had used its zoning power to protect an incumbent billboard provider against competition, we found that the clear-articulation test was easily satisfied even though the state statutes delegating zoning authority to the city did not explicitly permit the suppression of competition. We explained that "[t]he very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of com-petition" and that a zoning ordinance regulating the size, location, and spacing of billboards "necessarily protects existing billboards against some competition from new-comers." 499 U. S., at 373. Other cases in which we have found a "clear articulation" of the State's intent to displace competition without an explicit statement have also in-volved authorizations to act or regulate in ways that were inherently anticompetitive.[7]

––––––––––

[7] See *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 64, 65, and n. 25 (1985) (finding that a state commission's decision to encourage collective ratemaking by common carriers was entitled to state-action immunity where the legislature had left "[t]he details of the inherently anticompetitive rate-setting process . . . to the agency's discretion"); *Hallie* v. *Eau Claire*, 471 U. S. 34, 42 (1985)

By contrast, "simple permission to play in a market" does not "foreseeably entail permission to roughhouse in that market unlawfully." *Kay Elec. Cooperative* v. *Newkirk*, 647 F. 3d 1039, 1043 (CA10 2011). When a State grants some entity general power to act, whether it is a private corporation or a public entity like the Authority, it does so against the backdrop of federal antitrust law. See *Ticor Title*, 504 U. S., at 632. Of course, both private parties and local governmental entities conceivably may transgress antitrust requirements by exercising their general powers in anticompetitive ways. But a reasonable legislature's ability to anticipate that (potentially undesirable) possibility falls well short of clearly articulating an affirmative state policy to displace competition with a regulatory alternative.

Believing that this case falls within the scope of the foreseeability standard applied in *Hallie* and *Omni*, the Court of Appeals stated that "[i]t defies imagination to suppose the [state] legislature could have believed that every geographic market in Georgia was so replete with hospitals that authorizing acquisitions by the authorities could have no serious anticompetitive consequences." 663 F. 3d, at 1377. Respondents echo this argument, noting that each of Georgia's 159 counties covers a small geographical area and that most of them are sparsely populated, with nearly three-quarters having fewer than 50,000 residents as of the 2010 Census. Brief for Respondents 46.

Even accepting, *arguendo*, the premise that facts about a market could make the anticompetitive use of general

––––––––––

(describing *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 439 U. S. 96 (1978), as a case where there was not an "express intent to displace the antitrust laws" but where the regulatory structure at issue restricting the establishment or relocation of automobile dealerships "inherently displaced unfettered business freedom" (internal quotation marks and brackets omitted)).

corporate powers "foreseeable," we reject the Court of Appeals' and respondents' conclusion because only a relatively small subset of the conduct permitted as a matter of state law by Ga. Code Ann. §31–7–75(4) has the potential to negatively affect competition. Contrary to the Court of Appeals' and respondents' characterization, §31–7–75(4) is not principally concerned with hospital authorities' ability to acquire multiple hospitals and consolidate their operations. Section 31–7–75(4) allows authorities to acquire "projects," which includes not only "hospitals," but also "health care facilities, dormitories, office buildings, clinics, housing accommodations, nursing homes, rehabilitation centers, extended care facilities, and other public health facilities." §31–7–71(5). Narrowing our focus to the market for hospital services, the power to acquire hospitals still does not ordinarily produce anticompetitive effects. Section 31–7–75(4) was, after all, the source of power for newly formed hospital authorities to acquire a hospital in the first instance—a transaction that was unlikely to raise any antitrust concerns even in small markets because the transfer of ownership from private to public hands does not increase market concentration. See 1A Areeda & Hovenkamp ¶224e(c), at 126 ("[S]ubstitution of one monopolist for another is not an antitrust violation"). While subsequent acquisitions by authorities have the potential to reduce competition, they will raise federal antitrust concerns only in markets that are large enough to support more than one hospital but sufficiently small that the merger of competitors would lead to a significant increase in market concentration. This is too slender a reed to support the Court of Appeals' and respondents' inference.

## IV

### A

Taking a somewhat different approach than the Court of Appeals, respondents insist that the Law should not be

read as a mere authorization for hospital authorities to participate in the hospital-services market and exercise general corporate powers. Rather, they contend that hospital authorities are granted unique powers and responsibilities to fulfill the State's objective of providing all residents with access to adequate and affordable health and hospital care. See, *e.g.,* Ga. Code Ann. §31–7–75(22). Respondents argue that in view of hospital authorities' statutory objective, their specific attributes, and the regulatory context in which they operate, it was foreseeable that authorities facing capacity constraints would decide they could best serve their communities' needs by acquiring an existing local hospital rather than incur the additional expense and regulatory burden of expanding a facility or constructing a new one. See Brief for Respondents 33–39.

In support of this argument, respondents observe that hospital authorities are simultaneously empowered to act in ways private entities cannot while also being subject to significant regulatory constraints. On the power side, as the Court of Appeals noted, 663 F. 3d, at 1376–1377, hospital authorities may acquire through eminent domain property that is "essential to the [authority's] purposes." §31–7–75(12).[8] On the restraint side, hospital authorities are managed by a publicly accountable board, §§31–7–74.1, 31–7–76, they must operate on a nonprofit basis, §31–7–77, and they may only lease a project for others to

_____

[8] The Court of Appeals also invoked Ga. Code Ann. §31–7–84, which provides that hospital authorities do not have the power to assess taxes, but allows the applicable governing body in the authority's area of operation to impose taxes to cover the authority's expenses. See 663 F. 3d, at 1377. This provision applies in cases in which the county or municipality has entered into a contract with a hospital authority for the use of its facilities. See §§31–7–84(a), 31–7–85. No such contract exists in this case, and respondents have not relied on this provision in briefing or argument before us.

operate after determining that doing so will promote the community's public health needs and that the lessee will not receive more than a reasonable rate of return on its investment, §31–7–75(7).  Moreover, hospital authorities operate within a broader regulatory context in which Georgia requires any party seeking to establish or significantly expand certain medical facilities, including hospitals, to obtain a certificate of need from state regulators. See §31–6–40 *et seq*.[9]

We have no doubt that Georgia's hospital authorities differ materially from private corporations that offer hospital services.  But nothing in the Law or any other provision of Georgia law clearly articulates a state policy to allow authorities to exercise their general corporate powers, including their acquisition power, without regard to negative effects on competition.  The state legislature's objective of improving access to affordable health care does not logically suggest that the State intended that hospital authorities pursue that end through mergers that create monopolies.  Nor do the restrictions imposed on hospital authorities, including the requirement that they operate on a nonprofit basis, reveal such a policy.  Particularly in light of our national policy favoring competition, these

––––––––––

[9] Georgia first adopted certificate of need legislation in 1978 in part to comply with a since-repealed federal law conditioning federal funding for a number of health care programs on a State's enactment of certificate of need laws.  See 1978 Ga. Laws p. 941, as amended, Ga. Code Ann. §31–6–40 *et seq.* (2012); see also National Health Planning and Resources Development Act of 1974, 88 Stat. 2246, repealed by §701(a), 100 Stat. 3799.  Many other States also have certificate of need laws. See National Conference of State Legislatures, Certificate of Need: State Health Laws and Programs, online at http://www.ncsl.org/issues-research/health/con-certificate-of-need-state-laws.aspx (as visited Feb. 15, 2013, and available in Clerk of Court's case file) (indicating in "States with CON Programs" table that 35 States retained some type of certificate of need program as of December 2011 while 15 other States had such programs but have repealed them).

restrictions should be read to reflect more modest aims. The legislature may have viewed profit generation as incompatible with its goal of providing care for the indigent sick. In addition, the legislature may have believed that some hospital authorities would operate in markets with characteristics of natural monopolies, in which case the legislature could not rely on competition to control prices. See *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 595–596 (1976).

We recognize that Georgia, particularly through its certificate of need requirement, does limit competition in the market for hospital services in some respects. But regulation of an industry, and even the authorization of discrete forms of anticompetitive conduct pursuant to a regulatory structure, does not establish that the State has affirmatively contemplated other forms of anticompetitive conduct that are only tangentially related. Thus, in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), we rejected a state-action defense to price-fixing claims where a state bar adopted a compulsory minimum fee schedule. Although the State heavily regulated the practice of law, we found no evidence that it had adopted a policy to displace price competition among lawyers. *Id.*, at 788–792. And in *Cantor*, we concluded that a state commission's regulation of rates for electricity charged by a public utility did not confer state-action immunity for a claim that the utility's free distribution of light bulbs restrained trade in the light-bulb market. 428 U. S., at 596.

In this case, the fact that Georgia imposes limits on entry into the market for medical services, which apply to both hospital authorities and private corporations, does not clearly articulate a policy favoring the consolidation of existing hospitals that are engaged in active competition. Accord, *FTC* v. *University Health, Inc.*, 938 F. 2d 1206, 1213, n. 13 (CA11 1991). As to the Authority's eminent domain power, it was not exercised here and we do not

find it relevant to the question whether the State authorized hospital authorities to consolidate market power through potentially anticompetitive acquisitions of existing hospitals.

B

Finally, respondents contend that to the extent there is any doubt about whether the clear-articulation test is satisfied in this context, federal courts should err on the side of recognizing immunity to avoid improper interference with state policy choices. See Brief for Respondents 43–44. But we do not find the Law ambiguous on the question whether it clearly articulates a policy authorizing anticompetitive acquisitions; it does not.

More fundamentally, respondents' suggestion is inconsistent with the principle that "state-action immunity is disfavored." *Ticor Title*, 504 U. S., at 636. *Parker* and its progeny are premised on an understanding that respect for the States' coordinate role in government counsels against reading the federal antitrust laws to restrict the States' sovereign capacity to regulate their economies and provide services to their citizens. But federalism and state sovereignty are poorly served by a rule of construction that would allow "essential national policies" embodied in the antitrust laws to be displaced by state delegations of authority "intended to achieve more limited ends." 504 U. S., at 636. As an *amici* brief filed by 20 States in support of the FTC contends, loose application of the clear-articulation test would attach significant unintended consequences to States' frequent delegations of corporate authority to local bodies, effectively requiring States to disclaim any intent to displace competition to avoid inadvertently authorizing anticompetitive conduct. Brief for State of Illinois et al. as *Amici Curiae* 12–17; see also *Surgical Care Center of Hammond, L. C.* v. *Hospital Serv. Dist. No. 1*, 171 F. 3d 231, 236 (CA5 1999) (en banc). We

Opinion of the Court

decline to set such a trap for unwary state legislatures.

*     *     *

We hold that Georgia has not clearly articulated and affirmatively expressed a policy to allow hospital authorities to make acquisitions that substantially lessen competition.  The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*