KAVANAUGH, Circuit Judge,
concurring:
Video programming distributors such as Comcast deliver video programming networks to consumers. Under Section 616 of the Communications Act, a video programming distributor may not discriminate against an unaffiliated programming network in a way that “unreasonably restraints]” the unaffiliated network’s ability to compete fairly. Applying that statute in this case, the FCC found that Comcast discriminated against the unaffiliated Tennis Channel network by refusing to carry that network on the same cable tier that Comcast carries its affiliated Golf Channel *988 and Versus networks. The FCC also found that the discrimination unreasonably restrained the Tennis Channel’s ability to compete fairly. As a remedy, the FCC ordered Comcast to carry the Tennis Channel on the same tier that it carries the Golf Channel and Versus.
As the Court’s opinion explains, the FCC erred in concluding that Comcast discriminated against the Tennis Channel on the basis of affiliation. I join the Court’s opinion in full. I write separately to point out that the FCC also erred in a more fundamental way. Section 616’s use of the phrase “unreasonably restrain”—an antitrust term of art—establishes that the statute applies only to discrimination that amounts to an unreasonable restraint under antitrust law. Vertical integration and vertical contracts—for example, between a video programming distributor and a video programming network—become potentially problematic under antitrust law only when a company has market power in the relevant market. It follows that Section 616 applies only when a video programming distributor possesses market power. But Comcast does not have market power in the national video programming distribution market, the relevant market analyzed by the FCC in this case. Therefore, as I will explain in Part I of this opinion, Section 616 does not apply here.
Applying Section 616 to a video programming distributor that lacks market power not only contravenes the terms of the statute, but also violates the First Amendment as it has been interpreted by the Supreme Court. As I will explain in Part II of this opinion, the canon of constitutional avoidance thus strongly reinforces the conclusion that Section 616 applies only when a video programming distributor possesses market power.
I
Section 616 of the Communications Act requires the FCC to:
prevent a multichannel video programming distributor from engaging in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage of video programming provided by such vendors.
47 U.S.C. § 536(a)(3) (emphasis added); see 47 C.F.R. § 76.1301(c). The statutory text establishes that a Section 616 violation has two elements. First, the video programming distributor must have discriminated against an unaffiliated video programming network on the basis of affiliation. Second, the video programming distributor’s discrimination must have “unreasonably restrain[ed]” the unaffiliated network’s ability “to compete fairly.”
Congress enacted Section 616 (over the veto of President George H.W. Bush) as part of the Cable Television Consumer Protection and Competition Act of 1992, known as the Cable Act. The Cable Act included numerous provisions designed to curb abuses of cable operators’ bottleneck monopoly power and to promote competition in the cable television industry. When the Act was passed, however, the video programming market looked quite different than it looks today. At the time, most households subscribed to cable in order to view television programming. And as Congress noted, “most cable television subscribers [had] no opportunity to select between competing cable systems.” Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102-385, § 2(a)(2), 106 Stat. 1460, 1460 (1992). Congress decided to proactively counteract *989 the bottleneck monopoly power that cable operators possessed in many local markets.
The Cable Act employs a variety of tools to advance competition. ■ Some provisions directly prohibit practices that Congress viewed as anticompetitive in the market at the time. For example, the Act prohibits local franchising authorities from granting exclusive franchises to cable operators. See id. § 7(a), 106 Stat. at 1483. Similarly, the Act’s “must-carry” provisions require cable operators to carry a specified number of local broadcast stations. See id. § 4,106 Stat. at 1471.
In other parts of the Act, Congress borrowed from antitrust law, authorizing the FCC to regulate cable operators’ conduct in accordance with antitrust principles. For example, the Act requires the FCC, when prescribing limits on the number of cable subscribers or affiliated channels, to take account of “the nature and market power of the local franchise.” See id. §, 11(c), 106 Stat. at 1488. Similarly, the Act allows rate regulation only of those cable systems that are not subject to effective competition. See id. § 3, 106 Stat. at 1464.
The provision at issue in this case, Section 616, incorporates traditional antitrust principles. Section 616 does not categorically forbid a video programming distributor from extending preferential treatment to affiliated video programming networks or lesser treatment to unaffiliated video programming networks. Rather, to violate Section 616, a video programming distributor must discriminate among video programming networks on the basis of affiliation, and the discrimination must “unreasonably restrain” an unaffiliated network’s ability to compete fairly. 47 U.S.C. § 536(a)(3).
The phrase “unreasonably restrain” is of course a longstanding term of art in antitrust law. See, e.g., Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (“[T]he Court has repeated time and again that § 1 outlaws only unreasonable restraints.”) (internal quotation marks and alteration omitted); State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (“Although the Sherman Act, by its terms, prohibits every agreement ‘in restraint of trade,’ this Court has long recognized that Congress intended to outlaw only unreasonable restraints.”); Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (“Since the earliest decisions of this Court interpreting [Section 1 of the Sherman Act], we have recognized that it was intended to prohibit only unreasonable restraints of trade.”).
When a statute uses a term of art from a specific field of law, we presume that Congress adopted “the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.” FAA v. Cooper, — U.S. -, 132 S.Ct. 1441, 1449, 182 L.Ed.2d 497 (2012) (internal quotation mark omitted); see also Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598, 615, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Scalia, J., concurring) (“Words that have acquired a specialized meaning in the legal context must be accorded their legal meaning.”); McDermott International, Inc. v. Wilander, 498 U.S. 337, 342, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) (“In the absence of contrary indication, we assume that when a statute uses such a term [of art], Congress intended it to have its established meaning.”); Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (“[A]bsence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.”); Antonin Soalia & Bhyan *990 A. GARNER, Reading Law: The Interpretation of Legal Texts 73 (2012) (where “a word is obviously transplanted from another legal source, ... it brings the old soil with it”) (internal quotation mark omitted); cf. FTC v. Phoebe Putney Health System, Inc., — U.S. -, 133 S.Ct. 1003, 1015, 185 L.Ed.2d 43 (2013) (reading statute “in light of our national policy favoring competition”).
From the “term of art” canon and Section 616’s use of the antitrust term of art “unreasonably restrain,” it follows that Section 616 incorporates antitrust principles governing unreasonable restraints.
So what does antitrust law tell us? In antitrust law, certain activities are considered per se anticompetitive. Otherwise, however, conduct generally can be considered unreasonable only if a firm, or multiple firms acting in concert, have market power. See Leegin Creative Leather Products, 551 U.S. at 885-86, 127 S.Ct. 2705; Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); see also Standard Oil Co. v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926 (1931).
This case involves vertical integration and vertical contracts. Beginning in the 1970s (well before the 1992 Cable Act), the Supreme Court has recognized the legitimacy of vertical integration and vertical contracts by firms without market power. See, e.g., Leegin Creative Leather Products, 551 U.S. 877, 127 S.Ct. 2705; State Oil Co., 522 U.S. 3, 118 S.Ct. 275; Business Electronics, 485 U.S. 717, 108 S.Ct. 1515; Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Vertical integration and vertical contracts become potentially problematic only when a firm has market power in the relevant market. That’s because, absent market power, vertical integration and vertical contracts are procompetitive. Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers. See Douglas H. Ginsburg, Vertical Restraints: De Facto Legality Under the Rule of Reason, 60 Antitrust L.J. 67, 76 (1991) (“Antitrust law is a bar to the use of vertical restraints only in markets in which there is no apparent interbrand competition to protect consumers from a potentially welfare-decreasing restraint on intrabrand competition.”); Dennis L. Weisman & Robert B. Kulick, Price Discrimination, Two-Sided Markets, and Net Neutrality Regulation, 13 Tul. J. Tech. & Intell. Prop. 81, 99 (2010) (“[M]onopoly power in one market is a necessary condition for anti-competitive effects in almost all models of anticompetitive vertical integration.”); see also 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 756a, at 9 (3d ed.2008) (vertical integration “is either competitively neutral or affirmatively desirable because it promotes efficiency”); Robert H. Bork, The Antitrust Paradox 226 (1978) (“vertical integration is indispensable to the realization of productive efficiencies”).
Not surprisingly given their procompetitive characteristics, vertical integration and vertical contracts are common and accepted practices in the American economy: Apple’s iPhones contain integrated hardware and software, Dunkin’ Donuts sells Dunkin’ Donuts coffee, Ford produces radiators for its cars, McDonalds sells Big Macs, Nike stores are stocked with Nike shoes, Netflix owns “House of Cards,” and so on. As Professors Areeda and Hovenkamp have explained, vertical integration “is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive *991 markets.” 3B Areeda & Hovenkamp, AntitRust Law ¶ 755c, at 6.
Following the lead of the Supreme Court and influential academic literature on which the Supreme Court has relied in the antitrust field, this Court’s case law has stated that vertical integration and vertical contracts are procompetitive, at least absent market power. See Cablevision Systems Corp. v. FCC, 649 F.3d 695, 721 (D.C.Cir.2011) (vertical integration is “not always pernicious and, depending on market conditions, may actually be pro-competitive”); National Fuel Gas Supply Corp. v. FERC, 468 F.3d 831, 840 (D.C.Cir.2006) (“We began by emphasizing that vertical integration creates efficiencies for consumers.”); Tenneco Gas v. FERC, 969 F.2d 1187, 1201 (D.C.Cir.1992) (“[Advantages a pipeline gives its affiliate are improper only to the extent that they flow from the pipeline’s anti-competitive market power. Otherwise vertical integration produces permissible efficiencies that cannot by themselves be considered uses of monopoly power.”) (internal quotation marks omitted); see also Cablevision Systems Corp. v. FCC, 597 F.3d 1306, 1325 (D.C.Cir.2010) (Kavanaugh, J., dissenting) (“At least unless a company possesses market power in the relevant market, vertical integration and exclusive vertical contracts are not anti-cpmpetitive; on the contrary, such arrangements are ‘presumptively procompetitive.’ ”) (quoting 11 HERBERT Hovenkamp, Antitrust Law ¶ 1803, at 100 (2d ed.2005)).
Now back to Section 616: Because Section 616 incorporates antitrust principles and because antitrust law holds that vertical integration and vertical contracts are potentially problematic only when a firm has market power in the relevant market, it follows that Section 616 applies only when a video programming distributor has market power in the relevant market.[1] Section 616 thus does not bar vertical integration or vertical contracts that favor affiliated video programming networks, absent a showing that the video programming distributor at least has market power in the relevant market. To conclude otherwise would require us to depart from the established meaning of the term of art “unreasonably restrain” that Section 616 uses. Moreover, to conclude otherwise would require us to believe that Congress intended to thwart procompetitive practices. It would of course make little sense to attribute that motivation to Congress.
How, then, did the FCC reach the opposite conclusion in this case? The short answer is that the FCC badly misread the statute. Contrary to the plain language of Section 616, the FCC stated that the term “unreasonably” modified “discriminating” not “restrain”—even though Section 616 says it applies only to discriminatory conduct that “unreasonably restraints]” the ability of a competitor to compete fairly. See Order ¶¶ 43, 85-86. Because the FCC did not read Section 616 as written, it did not recognize the antitrust term of art “unreasonably restrain” that is apparent on the face of the statute. That erroneous reading of the text, in turn, led the FCC to mistakenly focus on the effects of Com-cast’s conduct on a competitor (the Tennis Channel) rather than on overall competi *992 tion. See id. ¶¶ 83-85.[2] That was a mistake because the goal of antitrust law (and thus of Section 616) is to promote consumer welfare by protecting competition, not by protecting individual competitors. See, e.g., NYNEX Corp. v. Discon, Inc., 625 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (Sherman Act plaintiff “must allege and prove harm, not just to a single competitor, but to the competitive process, 1.e., to competition itself’); Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (“The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.”); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (“The antitrust laws ... were enacted for the protection of competition, not competitors.”) (internal quotation marks omitted); see also Areeda & Hovenkamp, Antitrust Law ¶ 755c, at 6 (“[E]ven competitively harmless vertical integration can injure rivals or vertically related firms, but such injuries are not the concern of the antitrust laws.”).
It is true that Section 616 references discrimination against competitors. But again, the statute does not ban such discrimination outright. It bans discrimination that unreasonably restrains a competitor from competing fairly. By using the phrase “unreasonably restrain,” the statute incorporates an antitrust term of art, and that term of art requires that the discrimination in question hinder overall competition, not just competitors.
In sum, Section 616 targets instances of preferential program carriage that are anticompetitive under the antitrust laws. Section 616 thus may apply only when a video programming distributor possesses market power in the relevant market. Comcast has only about a 24% market share in the national video programming distribution market; it does not possess market power in the market considered by the FCC in this case. See Order ¶ 87.[3] Therefore, the FCC erred in finding that Comcast violated Section 616.
II
To the extent there is uncertainty about whether the phrase “unreasonably restrain” in Section 616 means that the statute applies only in cases of market power or instead may have a broader reach, we must construe the statute to avoid “serious constitutional concerns.” Edward J. De-Bartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 577, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); see also Solid Waste Agency of Northern Cook County v. Army Corps of Engineers, 531 U.S. 159, 172, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).[4] That canon strongly supports limiting Section 616 to *993 cases of market power. Applying Section 616 to a video programming distributor that lacks market power would raise serious First Amendment questions under the Supreme Court’s case law. Indeed, applying Section 616 to a video programming distributor that lacks market power would violate the First Amendment as it has been interpreted by the Supreme Court.
To begin, with, the Supreme Court has squarely held that a video programming distributor such as Comcast both engages in and transmits speech, and is therefore protected by the First Amendment. See Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 636, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Just as a newspaper exercises editorial discretion over which articles to run, a video programming distributor exercises editorial discretion over which video programming networks to carry and at what level of carriage.
It is true that, under the Supreme Court’s precedents, Section 616’s impact on a cable operator’s editorial control is content-neutral and thus triggers only intermediate scrutiny rather than strict scrutiny. See id. at 642-43,114 S.Ct. 2445. But the Supreme Court’s case law applying intermediate scrutiny in this context provides that the Government may interfere with a video programming distributor’s editorial discretion only when the video programming distributor possesses market power in the relevant market.
In its 1994 decision in Turner Broadcasting, the Supreme Court ruled that the Cable Act’s must-carry provisions might satisfy intermediate First Amendment scrutiny, but the Court rested that conclusion on “special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television.” Id. at 661, 114 S.Ct. 2445. When a cable operator has bottleneck power, the Court explained, it can “silence the voice of competing speakers with a mere flick of the switch.” Id. at 656, 114 S.Ct. 2445. In subsequently upholding the must-carry provisions, the Court reiterated that cable’s bottleneck monopoly power was critical to the First Amendment calculus. See Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 197-207, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (controlling opinion of Kennedy, J.).[5] The Court stated that “cable operators possessed] a local monopoly over cable households,” with only one percent of communities being served by more than one cable operator. Id. at 197, 117 S.Ct. 1174.
In 1996, when this Court upheld the Cable Act’s exclusive-contract provisions against a First Amendment challenge, we likewise pointed to the “special characteristics” of the cable industry. See Time Warner Entertainment Co. v. FCC, 93 F.3d 957 (D.C.Cir.1996). Essential to our decision were “both the bottleneck monopoly power exercised by cable operators and the unique power that vertically integrated companies have in the cable market.” Id. at 978 (internal quotation marks and citation omitted).
But in the 16 years since the last of those cases was decided, the video programming distribution market has changed dramatically, especially with the rapid growth of satellite and Internet providers. This Court has previously described the massive transformation, ex *994 plaining that cable operators “no longer have the bottleneck power over programming that concerned the Congress in 1992.” Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C.Cir.2009); see also Cablevision Systems Corp. v. FCC, 597 F.3d 1306, 1324 (D.C.Cir.2010) (Kavanaugh, J., dissenting) (“This radically changed and highly competitive marketplace—where no cable operator exercises market power in the downstream or upstream markets and no national video programming network is so powerful as to dominate the programming market—completely eviscerates the justification we relied on in Time Warner for the ban on exclusive contracts.”); Christopher S. Yoo, Vertical Integration and Media Regulation in the New Economy, 19 Yale J. on Reg. 171, 229 (2002) (“It thus appears that the national market for MVPDs is already too unconcentrated to support the conclusion that vertical integration could have any anti-competitive effects.”).
In today’s highly competitive market, neither Comcast nor any other video programming distributor possesses market power in the national video programming distribution market. To be sure, beyond an interest in policing anticompetitive behavior, the FCC may think it preferable simply as a communications policy matter to equalize or enhance the voices of various entertainment and sports networks such as the Tennis Channel. But as the Supreme Court stated in one of the most important sentences in First Amendment history, “the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.” Buckley v. Valeo, 424 U.S. 1, 48-49, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).
Therefore, under these circumstances, the FCC cannot tell Comcast how to exercise its editorial discretion about what networks to carry any more than the Government can tell Amazon or Politics and Prose or Barnes & Noble what books to sell; or tell the Wall Street Journal or Politico or the Drudge Report what columns to carry; or tell the MLB Network or- ESPN or CBS what games to show; or tell SCOTUSblog or How Appealing or The Volokh Conspiracy what legal briefs to feature.
In light of the Supreme Court’s precedents interpreting the First Amendment and the massive changes to the video programming distribution market over the last two decades, the FCC’s interference with Comcast’s editorial discretion cannot stand. In restricting the editorial discretion of video programming distributors, the FCC cannot continue to implement a regulatory model premised on a 1990s snapshot of the cable market.
The Supreme Court’s precedents amply demonstrate that the FCC’s interpretation of Section 616 violates the First Amendment. At a minimum, the Supreme Court’s precedents raise serious First Amendment questions about the FCC’s interpretation of Section 616. Under the constitutional avoidance canon, those serious constitutional questions require that we construe Section 616 to apply only when a video programming distributor possesses market power.
The FCC erred in concluding that Section 616 may apply to a video programming distributor without market power. For that reason, in addition to the reasons given by the Court, the FCC’s Order cannot stand.

. Section 616 and the Cable Act provisions that incorporate antitrust principles are not merely redundant of antitrust law. To be sure, the Federal Trade Commission and the U.S. Department of Justice Antitrust Division enforce federal antitrust laws, and private citizens may bring civil antitrust suits -as well. But in the Cable Act, Congress authorized a separate enforcement agency, the FCC, to regulate certain practices of cable operators. For that reason, even Cable Act provisions such as Section 616 that mirror existing antitrust proscriptions serve an important regulatory purpose, akin to adding new police officers to enforce an existing law.

. Because the FCC's Order never actually interpreted the phrase "unreasonably restrain," we would have to remand even if we thought Section 616 reasonably could be applied to video programming distributors without market power. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

. In some local geographic markets around the country, a video programming distributor may have market power. This case does not call upon us to consider how Section 616 would apply to discrimination against unaffiliated networks in such local markets.

.There is some debate about how serious the statute’s constitutional questions must be, and indeed whether the statute otherwise must be unconstitutional, for the avoidance doctrine to apply. See generally Richard A. Posner, Statutory Interpretation—in the Classroom and in the Courtroom, 50 U. Chi. L. Rev. 800, 816 (1983) (criticizing the avoidance doctrine as a "judge-made constitutional penumbra’ ”). That debate is irrelevant to my analysis here because I have concluded that it would indeed be unconstitutional to apply Section 616 absent market power.

. In the 1997 Turner Broadcasting case, Justice Kennedy’s opinion represented the “position taken by those Members who concurred in the judgment[ ] on the narrowest grounds.” See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation mark omitted). That opinion’s evaluation of anticompetitive behavior and the significance of bottleneck power analytically lay between that of Justice Breyer's concurring opinion on the one hand and the dissent on the other.