# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2021

Lyle W. Cayce
Clerk

No. 20-20447

Quadvest, L.P.; Woodland Oaks Utility, L.P.,

*Plaintiffs—Appellees*,

*versus*

San Jacinto River Authority,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-4508

Before Wiener, Elrod, and Higginson, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Plaintiffs-Appellees Quadvest and Woodland Oaks Utility, investor-owned water utilities, sued Defendant-Appellant San Jacinto River Authority ("SJRA"), a state entity, alleging that SJRA violated Section 1 of the Sherman Act when it entered into and enforced contracts relating to the purchase of wholesale water in Montgomery County, Texas. SJRA asserted its entitlement to state-action antitrust immunity in a motion to dismiss, which the district court denied. We AFFIRM.

No. 20-20447

I.

Quadvest and Woodland Oaks Utility ("Plaintiffs") entered into contracts with SJRA governing Plaintiffs' purchase and use of water. Plaintiffs now challenge those contracts as anticompetitive in violation of Sherman Act Section 1. The instant interlocutory appeal asserts that SJRA is entitled to state-action immunity from Plaintiffs' lawsuit because the contracts were entered into and are enforced pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation. *See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). We first discuss SJRA's creation and its enabling statute.

*A. Creation of SJRA and Enabling Statute*

SJRA is a political subdivision of the State of Texas, created in 1937 by the Texas Legislature to conserve, control, and utilize the storm and flood waters of the San Jacinto River and its tributary streams. According to Plaintiffs' First Amended Complaint ("FAC"), SJRA owns one-third of the water rights to the surface water in Lake Conroe in addition to groundwater-producing wells. Plaintiffs assert that SJRA is both a water wholesaler and retailer, (1) wholesaling raw and treated surface water to utilities that re-sell the water to their end-user customers, (2) wholesaling raw groundwater to municipal utility districts that serve The Woodlands, and (3) retailing raw surface water to its own end-user customers.[1]

---

[1] Although the FAC describes SJRA as wholesaling only "raw surface water" to utilities, the GRP Contracts provide for SJRA to also wholesale treated surface water to utilities.

No. 20-20447

SJRA's Enabling Statute, as amended,[2] vests SJRA with the authority to:

- "store, control and conserve the storm and flood waters of the watershed of the San Jacinto River and its tributaries," (§ 3(i));

- "provide water for domestic, municipal, commercial, industrial and mining purposes . . . including water supplies for cities, towns and industries, and in connection therewith to construct or otherwise acquire water transportation, treatment and distribution facilities and supplemental sources of supply," (§ 3(v));

- "enter into any and all necessary and proper contracts . . . necessary or useful in the furtherance of any power granted by law to [SJRA]," (§ 3(xv)); and

- "enter into such contracts . . . with municipalities or other corporate bodies or persons, public or private, for the purpose of establishing and collecting . . . rates and other charges for the sale or use of water, water transmission, treatment or connection facilities . . . and any other services sold, furnished or supplied by [SJRA]," (§ 3(xviii)).

*B.  The Lone Star District Regulatory Plan*

In June 2006, the Texas Water Development Board, in association with SJRA and Lone Star Groundwater Conservation District (a state entity charged with regulating groundwater use in Montgomery County),

---

[2] *See* 1937 Tex. Gen. & Spec. Laws, ch. 426; 1939 Tex. Gen. & Spec. Laws, ch. 10; 1941 Tex. Gen. Laws, chs. 480 & 613; 1943 Tex. Gen. Laws, ch. 371; 1951 Tex. Gen. Laws, chs. 366 & 367; 1967 Tex. Gen. Laws, ch. 547; 1991 Tex. Gen. Laws, ch. 698; 2003 Tex. Gen. Laws, ch. 847; 2015 Tex. Gen. Laws, ch. 1148.

According to the FAC, SJRA's Enabling Statute was deleted from Vernon's Texas Statutes and Codes Annotated when they were recodified but was not relocated to a new code. All citations in this opinion are to the version of SJRA's Enabling Statute that is currently in force, which Plaintiffs compiled into a single document as an exhibit to the FAC. We append the full Enabling Statute to our decision for reference.

commissioned a study to assess the County's long-term groundwater supply needs. According to the FAC, groundwater has historically been less expensive, and thus more widely used, than surface water in Montgomery County. The study determined that, based on projections of future water needs, potable water demand would eventually exceed the estimated sustainable recharge rate of the Gulf Coast Aquifer (Montgomery County's source of groundwater), necessitating the use of surface water. The report further concluded that new surface water treatment facilities would need to be constructed to meet the projected need for potable surface water.

Citing the recommendations of the report, SJRA and Lone Star executed a Memorandum of Understanding ("MOU") by which the parties agreed to "pursue a cooperative implementation strategy . . . to finance and provide wholesale surface water to converting [groundwater] users," "to spread financing costs . . . in an equitable manner to all permitted users of water throughout [Montgomery] County, regardless of which particular users actually convert from groundwater to surface water," and to assess water use fees to "equalize the cost of groundwater and surface water."

Lone Star subsequently adopted a District Regulatory Plan (the "Lone Star Plan") to regulate groundwater production in Montgomery County, consistent with the MOU. Among other requirements, the Lone Star Plan mandated that all "large volume groundwater users" ("LVGUs")[3]

---

[3] The Lone Star Plan defined "Large Volume Groundwater User" or "LVGU" as "any person or entity that, through a single well or a combination of wells, actually produced or was authorized by a permit or permits issued by [Lone Star] to produce 10 million gallons or more of groundwater annually from the Gulf Coast Aquifer within the [Lone Star] District during calendar year 2009. A Large Volume Groundwater User does not include any person or entity that produces groundwater solely for its own domestic use associated with a single family residence, agricultural use, as that term is defined by Chapter 36, Water Code, or both domestic and agricultural use."

reduce their groundwater consumption to either (a) 70% of the volume they were permitted to produce in 2009 or (b) 10 million gallons (the "Groundwater Reduction Rule"). Alternatively, LVGUs could satisfy the Lone Star Plan by participating in a "joint groundwater reduction plan" ("Joint GRP") with one or more additional LVGUs, pursuant to which the LVGUs could achieve 30% groundwater use reduction on aggregate, rather than individually.

## C. SJRA's Groundwater Reduction Plan Contracts with Plaintiffs

In March 2011, SJRA (itself an LVGU subject to the Lone Star Plan) finalized a Joint GRP to allow participating LVGUs to collectively achieve compliance with Lone Star's Groundwater Reduction Rule. Under SJRA's Joint GRP, some LVGUs would "over convert" to surface water (i.e., reduce their groundwater consumption by greater than 30%), thereby allowing other LVGUs to continue to use more groundwater than would otherwise be permitted. According to an exhibit to the FAC, 140 of the 202 LVGUs in Montgomery County had joined the Joint GRP by executing contracts with SJRA as of February 8, 2011. Plaintiffs are each party to such a contract with SJRA (together, the "GRP Contracts").

The GRP Contracts require Plaintiffs to pay SJRA a volume-based fee for pumping groundwater, regardless of the source (the "Groundwater Pumpage Fee"). SJRA would use the Groundwater Pumpage Fee proceeds to develop a surface water treatment facility and transmission system. Plaintiffs allege that the Groundwater Pumpage Fee is calculated to equalize the costs of groundwater and surface water. Upon completion of the surface water treatment facility, the GRP Contracts allow SJRA to (1) require Plaintiffs to connect to SJRA's transmission system and (2) dictate how much surface water each Plaintiff must buy from SJRA (the "Surface Water Put Option"). The GRP Contracts also allow SJRA to charge a volume-based

fee on any water imported from a non-Joint GRP participant (the "Water Importation Fee").

*D. Montgomery County Water Utilities' Lawsuit Against Lone Star*

In 2015, Plaintiffs and other Montgomery County LVGUs sued Lone Star, alleging that it lacked statutory authority for the Groundwater Reduction Rule. After an initial state trial court ruling declaring the Rule void *ab initio* and an interlocutory appeal, the parties filed motions for partial non-suit following Lone Star's withdrawal of its appeal. The trial court thus entered a final judgment in May 2019 declaring that the Groundwater Reduction Rule had been adopted without legal authority and was thereby void.

*E. Procedural History*

Plaintiffs in the instant lawsuit are investor-owned water utilities that sell drinking water to retail consumers in Montgomery County and were subject to Lone Star's Groundwater Reduction Rule before it was invalidated. They aver that they rely exclusively on groundwater and do not buy surface water from SJRA.

Plaintiffs filed this lawsuit against SJRA on November 15, 2019, and amended their complaint on February 3, 2020. The FAC alleges that the GRP Contracts constitute continuing violations of Sherman Act Section 1, which declares that "[e]very contract . . . in restraint of trade or commerce among the several States . . . is . . . illegal." 15 U.S.C. § 1. Specifically, Plaintiffs assert that the Groundwater Pumpage Fee provision "constitute[s] [a] horizontal agreement[] between SJRA and each Plaintiff to fix the price of wholesale raw water in Montgomery County by assessing pumpage fees to LVGU participants so as to equalize the wholesale price of raw groundwater with the wholesale price of raw surface water." They further allege that the Surface Water Put Option and Water Importation Fee provisions are

unreasonable restraints of trade. Plaintiffs request a declaratory judgment that the GRP Contracts are illegal and unenforceable and an injunction prohibiting SJRA from enforcing the GRP Contracts or taking any other acts to enforce the Joint GRP.

SJRA moved to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the action was barred by the statute of limitations and laches, that SJRA was entitled to state-action immunity, and that the FAC failed to state a Sherman Act claim.

On August 14, 2020, the district court entered an order denying SJRA's motion to dismiss. Relevant to the instant interlocutory appeal, the district court concluded that SJRA had failed to demonstrate its entitlement to state-action immunity.

SJRA filed a notice of interlocutory appeal on August 21, 2020, appealing the district court's order denying its state-action immunity defense.

## II.

We must first examine the basis of our jurisdiction, a question we review de novo. *Mosley v. Cozby*, 813 F.2d 659, 660 (5th Cir. 1987); *United States v. Slovacek*, 699 F.3d 423, 425 (5th Cir. 2012).

Our precedent holds that the collateral order doctrine confers jurisdiction to review an interlocutory appeal of a district court's denial of state-action immunity in certain circumstances.[4] *See Martin v. Mem'l Hosp.*

---

[4] This issue is the subject of an active circuit split. Every other circuit to have considered this issue disagrees with our precedent, instead holding that interlocutory appeals from denials of state-action immunity may not be taken under the collateral order doctrine. *See Huron Valley Hosp., Inc. v. City of Pontiac*, 792 F.2d 563, 567–68 (6th Cir. 1986); *S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 441–47 (4th Cir. 2006); *SolarCity*

No. 20-20447

*at Gulfport*, 86 F.3d 1391, 1396–97 (5th Cir. 1996). The collateral order doctrine provides a "practical construction" of 28 U.S.C. § 1291's "final

---

*Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 727 (9th Cir.), *cert. granted*, 138 S. Ct. 499 (Dec. 1, 2017), *and cert. dismissed by agreement of the parties*, 138 S. Ct. 1323 (Mar. 22, 2018); *SmileDirectClub, LLC v. Battle*, No. 19-12227, 2021 U.S. App. LEXIS 21393, *18–19 (11th Cir. July 20, 2021) (en banc) (overruling the Eleventh Circuit's prior precedent which agreed with our *Martin* precedent, *Commuter Transp. Sys., Inc. v. Hillsborough Cnty. Aviation Auth.*, 801 F.2d 1286, 1290 (11th Cir. 1986)).

In 2017, the Supreme Court granted a writ of certiorari in *SolarCity* to decide "[w]hether orders denying state-action immunity to public entities are immediately appealable under the collateral-order doctrine." *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, No. 17-368, 138 S. Ct. 499 (Dec. 1, 2017). The parties reached a settlement agreement before oral argument was heard, however, and the Court dismissed the petition pursuant to the parties' agreement. 138 S. Ct. 1323 (Mar. 22, 2018). Last month, the en banc Eleventh Circuit held that "interlocutory appeals may not be taken under the collateral order doctrine from the denials of so-called 'state-action immunity,'" overruling its prior precedent. *SmileDirectClub,* 2021 U.S. App. LEXIS 21393, at *2, *18–19.

Other courts, in critiquing our precedent, have noted that (1) the Supreme Court has repeatedly emphasized the narrowness of the collateral order doctrine in recent decisions, *see SmileDirectClub,* 2021 U.S. App. LEXIS 21393, at *6; *SolarCity*, 859 F.3d at 730; (2) the Court in *Will v. Hallock* held that government defendants are not entitled to immediate appealability merely to avoid the burdens of trial absent "some particular value of a high order," *see SolarCity*, 859 F.3d at 724 (discussing 546 U.S. 345, 352–55 (2006)); *see also SmileDirectClub*, 2021 U.S. App. LEXIS 21393, at *16–17; and (3) as our en banc court has observed, "*Parker* immunity is an inapt description, for its parentage differs from the qualified and absolute immunities of public officials. . . . '*Parker* immunity' is more accurately a strict standard for locating the reach of the Sherman Act than the judicial creation of a defense to liability for its violation." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 171 F.3d 231, 234 (5th Cir. 1999) (en banc); *see S.C. State Bd. of Dentistry*, 455 F.3d at 444–45; *SmileDirectClub*, 2021 U.S. App. LEXIS 21393, at *9 ("There is some support for this aspect of *Commuter Transportation Systems*. For example, in *Martin* the Fifth Circuit also treated *Parker* as providing 'an entitlement not to stand trial under certain circumstances.' . . . Yet just four years later, the full Fifth Circuit—in a unanimous opinion—retreated from this facet of *Martin* in *Surgical Care Center of Hammond*." (citations omitted) (quoting *Martin v. Mem'l Hosp. at Gulfport*, 86 F.3d 1391, 1395 (5th Cir. 1996))). We remain bound, however, by our precedent absent reconsideration by our full court. We further note that neither party raised this issue in its appellate briefing nor during oral argument.

decision" requirement, *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)), rendering a district court's interlocutory decision immediately appealable if it "[1] conclusively determine[s] the disputed question, [2] resolve[s] an important issue completely separate from the merits of the action, and [3] [would] be effectively unreviewable on appeal from a final judgment," *Will v. Hallock*, 546 U.S. 345, 349 (2006) (internal quotation marks omitted).

In *Martin*, we held that denials of state-action immunity to state, state-entity, and municipal defendants are immediately appealable collateral orders because (1) "denials of states' and state entities' claims to state action immunity clearly purport to be conclusive determinations that they have no right not to be sued under federal antitrust laws"; (2) "[a]n appellate court reviewing the denial of the state or state entity's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim"; and (3) "state action immunity shares the essential element of absolute, qualified and Eleventh Amendment immunities—an entitlement not to stand trial under certain circumstances," which is "effectively lost if a case is erroneously permitted to go to trial." 86 F.3d at 1395–97 (internal quotation marks omitted).

However, this court does not allow such immediate appeals for private defendants because we must "view claims of a right not to be tried with skepticism" and "the state action doctrine does not immunize private defendants from suit." *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 292 (5th Cir. 2000) (internal quotation marks omitted). Accordingly, the denial of state-action immunity to a private party would not be effectively unreviewable on appeal from a final judgment. *Id.*

Plaintiffs argue that because SJRA is a participant in the market relevant to their antitrust claim—the market for wholesale raw water in Montgomery County—SJRA invokes state-action immunity as a private party rather than a state entity and is thereby subject to the doctrine's "active supervision" requirement. They rely on the Supreme Court's opinion in *North Carolina State Board of Dental Examiners v. FTC*, where in deciding that the active supervision requirement applied to a state regulatory board controlled by active market participants, the Court distinguished such boards, which are more akin to "private trade associations," from "prototypical state agencies." 574 U.S. 494, 511 (2015). Following *Dental Examiners*, we held that a state regulatory board composed of private market participants invoked state-action immunity "as a private party" and was thus unentitled to immediate appeal of a Federal Trade Commission order denying its state-action immunity defense. *See La. Real Est. Appraisers Bd. v. FTC*, 976 F.3d 597, 604 (5th Cir. 2020), *cert. denied*, 2021 U.S. LEXIS 1819, 2021 WL 1241021 (Apr. 5, 2021).

SJRA, like the defendant in *Martin*, is a state-created entity that, unlike the defendant in *Louisiana Real Estate Appraisers*, is not alleged to be controlled by private market participants. *See Martin*, 86 F.3d at 1395–97; *La. Real Est. Appraisers Bd.*, 976 F.3d at 604. However, the Supreme Court has rejected a "purely formalistic inquiry" into whether a defendant invokes state-action immunity as a prototypical state agency or a private party. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985); *see also La. Real Est. Appraisers Bd.*, 976 F.3d at 604. Relevant here, Plaintiffs allege that SJRA is an active participant in the market over which it purportedly exerts anticompetitive control.

In *Hallie* and again in *Dental Examiners*, the Court focused on the risk of private interests influencing a state entity's decisions. *See Hallie*, 471 U.S. at 45; *Dental Examiners*, 574 U.S. at 507–08; *see also La. Real Est. Appraisers*

*Bd.*, 976 F.3d at 604. As a public entity, SJRA is entitled to a presumption that it acts in the public interest "absent a showing to the contrary." *Hallie*, 471 U.S. at 45. Although SJRA allegedly participates in the Montgomery County wholesale raw water market, Plaintiffs have not shown at this early stage that SJRA is influenced by or pursues outside private interests. We thus conclude that, for the purposes of our jurisdictional analysis, SJRA invokes state-action immunity as a state entity. The instant interlocutory appeal is thereby proper under this court's precedent.

### III.

We now turn to the merits of SJRA's appeal. The district court denied SJRA's motion to dismiss, concluding that state-action immunity did not apply. On appeal, SJRA asserts that the district court erred because SJRA's entry into and enforcement of the GRP Contracts was authorized by its Enabling Statute, and the displacement of competition in the wholesale raw water market was the foreseeable result of this authorization. Plaintiffs maintain that SJRA's Enabling Statute does not authorize its anticompetitive conduct.

In reviewing the denial of a motion to dismiss under FRCP 12(b)(6), this court "tak[es] all well-pleaded facts as true." *Zantiz v. Seal*, 602 F. App'x 154, 159 (5th Cir. 2015) (per curiam) (unpublished) (citing *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)). When, as here, the complaint attaches written exhibits, the exhibits are considered "a part of the pleading for all purposes." FED. R. CIV. P. 10(c). If an attached exhibit contradicts a factual allegation in the complaint, "then indeed the exhibit and not the allegation controls." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004); *see also Smit v. SXSW Holdings, Inc.*, 903 F.3d 522, 528 (5th Cir. 2018).

A motion to dismiss is properly denied if, accepting the well-pled factual allegations in the plaintiff's complaint as true, the plaintiff states a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "State authorization is generally interpreted by an objective test that looks at the language of the statute; if other evidence is needed, it can be gleaned from legislative histories or state judicial decisions." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 171 F.3d 231, 234 (5th Cir. 1999) (en banc) (quoting 1 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 222b (1997)). This analysis "ordinarily produces a legal conclusion reviewed de novo." *Id.*

Thus, in reviewing the denial of a motion to dismiss based upon state-action immunity, we will affirm the denial if, taking the well-pleaded factual allegations in the complaint as true and looking to the language of the relevant authorizing statute (and, to the extent necessary, legislative history or judicial decisions), the defendant is not entitled to state-action immunity. *See, e.g., Earles v. State Bd. of Certified Pub. Accts.*, 139 F.3d 1033, 1040–44 (5th Cir. 1998).

## A.

Supreme Court precedent recognizes three tiers of protection from federal antitrust lawsuits under the state-action immunity doctrine: (1) clear exercises of a state's sovereign power are immune from federal antitrust scrutiny *ipso facto* ("*Parker* immunity"), *Dental Examiners*, 574 U.S. at 504 (discussing *Parker v. Brown*, 317 U.S. 341 (1943)); (2) acts of a "prototypical state agenc[y]" or municipality are entitled to immunity if pursuant to a "clearly articulated and affirmatively expressed" state policy to replace competition with regulation ("*Hallie* scrutiny"), *id.* at 504, 506–07, 511 (quoting *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013))

(discussing *Hallie*, 471 U.S. 34); and (3) actions by private parties or state agencies controlled by participants in the market they regulate are protected if they meet the aforementioned "clear articulation" requirement and are also subject to "active supervision" by the state ("*Midcal* scrutiny"), *id.* at 507 (discussing *Midcal*, 445 U.S. 97). Because "[s]tates regulate their economies in many ways not inconsistent with the antitrust laws," "state-action immunity is disfavored." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 635–36 (1992) (citing *Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 398–99 (1978)).

*Ipso facto Parker* immunity applies only for "[s]tate legislation and decisions of a state supreme court, acting legislatively rather than judicially." *Dental Examiners*, 574 U.S. at 504 (internal quotation marks omitted). This case does not fit those circumstances, and SJRA thus invokes state-action immunity as a nonsovereign actor.

Anticompetitive conduct by a nonsovereign actor must be "clearly articulated and affirmatively expressed as state policy" to merit state-action immunity. *Midcal*, 445 U.S. at 105 (quoting *La. Power & Light Co.*, 435 U.S. at 410). This inquiry involves two distinct questions: (1) Does state law authorize the defendant to engage in the challenged conduct?; and (2) Did the state authorize the challenged conduct with an intent to *displace competition* with regulation or monopoly service? 1A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 225, p. 140 (4th ed. 2013) ("Areeda & Hovenkamp"); *see also Phoebe Putney*, 568 U.S. at 228.

State lawmakers need not "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Hallie*, 471 U.S. at 43. Rather, state-action immunity applies if the anticompetitive effect was the "foreseeable result"

of the state's authorization. *Id.* at 42. "[W]hen anticompetitive consequences are simply one 'foreseeable' possibility among many, then authorization should not be inferred." Areeda & Hovenkamp at ¶ 225, p. 170 (discussing *Phoebe Putney*, 568 U.S. 216).

B.

Plaintiffs challenge three provisions of the GRP Contracts as anticompetitive in violation of Sherman Act Section 1: (1) the Groundwater Pumpage Fee, which requires Plaintiffs to pay SJRA a volume-based fee for pumping groundwater, regardless of the source; (2) the Surface Water Put Option, which allows SJRA to dictate the amount of surface water Plaintiffs must buy from SJRA; and (3) the Water Importation Fee, which charges Plaintiffs if they purchase water from a non-Joint GRP participant. The FAC alleges that the Groundwater Pumpage Fee fixes the price of wholesale raw water in Montgomery County by equalizing the wholesale price of raw groundwater with that of raw surface water, and also that the Surface Water Put Option and Water Importation Fee are unreasonable restraints of trade.

We first ask whether SJRA's Enabling Statute authorizes its entry into and enforcement of the challenged provisions. *See Phoebe Putney*, 568 U.S. at 228. SJRA may be correct that its Enabling Statute authorizes the challenged provisions. The Enabling Statute allows SJRA to contract with "municipalities or other corporate bodies or persons . . . for the purpose of establishing and collecting . . . rates and other charges for the sale or use of water, water transmission, treatment or connection facilities . . . and any other services sold, furnished or supplied by [SJRA]." Enabling Statute § 3(xviii). The Groundwater Pumpage Fee could be considered a rate or charge for a service provided by SJRA—coordinated compliance with Lone Star's Groundwater Reduction Rule—as well as a charge for the use of SJRA's water transmission, treatment, and connection facilities. Similarly,

the Surface Water Put Option could be viewed as a charge for the use of SJRA's facilities. The Enabling Statute also permits SJRA to "enter into any and all necessary and proper contracts . . . necessary or useful in the furtherance of any power granted by law." Enabling Statute § 3(xv). Though this statutory language is quite nonspecific, SJRA may have an argument that the Water Importation Fee is "necessary or useful" to provide the service of regulatory compliance to the Joint GRP participants.

But our inquiry does not end there. To warrant state-action immunity, the alleged anticompetitive effect—the displacement of competition in the Montgomery County wholesale raw water market—must be the "inherent, logical, or ordinary result" of the state's authorization. *Phoebe Putney*, 568 U.S. at 229. Section 3(xviii) of SJRA's Enabling Statute authorizes SJRA to participate in the markets for water, water transmission and treatment, and other services through contracts establishing rates and other charges. Precedent establishes that mere authorization to participate in a market does not constitute authority to monopolize that market. *See id.* at 228 ("Grants of general corporate power that allow substate governmental entities to participate in a competitive marketplace should be, can be, and typically are used in ways that raise no federal antitrust concerns."); *Hammond*, 171 F.3d at 235 (distinguishing "a statute that in empowering a municipality necessarily contemplates the anticompetitive activity from one that merely allows a municipality to do what other businesses can do").

SJRA's state authorization is more akin to the enabling laws at issue in *Phoebe Putney* and *Hammond*, where the defendants were statutorily authorized to acquire hospitals and enter into contracts and joint ventures to sell hospital services, respectively, than it is similar to the legislative grants in cases finding clear articulation. *See Phoebe Putney*, 568 U.S. at 219–20; *Hammond*, 171 F.3d at 233. The statutory powers SJRA invokes as authorizing its challenged conduct "should be, can be, and typically are used

in ways that raise no federal antitrust concerns." *Phoebe Putney*, 568 U.S. at 228. This statutory authorization lacks the indicators of monopolistic intent present in cases finding clear articulation, where the defendants were explicitly granted authority to regulate a market, such as through zoning ordinances, *City of Columbia v. Omni Outdoor Advert. Inc.*, 499 U.S. 365, 373 (1991), professional conduct rules, *Earles*, 139 F.3d at 1042, and the maintenance of "fair competition," *Spec's Fam. Partners, Ltd. v. Nettles*, 972 F.3d 671, 683 (5th Cir. 2020).

SJRA argues that monopoly is the foreseeable result of its statutory authorization because "[w]henever SJRA contracts with an entity to supply surface water (at cost, as SJRA must), other raw water competitors (like groundwater wholesale suppliers) are necessarily displaced." This argument contravenes precedent holding that bare authority to participate in a market does not inherently result in monopoly. *See Phoebe Putney*, 568 U.S. at 228; *Hammond*, 171 F.3d at 235. This assertion is further undermined by the FAC, which alleges that groundwater in Montgomery County is plentiful and was historically less expensive than surface water. Accepting this factual allegation as true, *Iqbal*, 556 U.S. at 678, statutory authority to sell surface water would not inherently, logically, or ordinarily result in the displacement of competition in the market for allegedly cheaper, plentiful groundwater.

Even if SJRA's Enabling Statute could be read as vesting SJRA with monopoly power over the market for surface water in Montgomery County, precedent cautions against interpreting such statutory authority as extending to the entire wholesale raw water market. "[E]ven a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *La. Power & Light Co.*, 435 U.S. at 417; *see also* AREEDA & HOVENKAMP at ¶ 222, p. 79 (citing *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40 (1982)) ("[A]uthorization from the state must be 'market-specific' in the sense that

it authorizes the subdivision to displace competition in a specific area of commerce."). Here, SJRA's hypothetical monopoly authority over the surface water market in Montgomery County would not foreseeably extend to the entire wholesale raw water market.

We therefore conclude, with attention to the record before us, that the Texas Legislature did not authorize SJRA's entry into and enforcement of the challenged GRP Contract provisions with the intent to displace competition in the market for wholesale raw water in Montgomery County. SJRA is thus not entitled to state-action immunity at this stage.

## IV.

For the foregoing reasons, we AFFIRM the district court's denial of SJRA's motion to dismiss based upon state-action immunity.

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

SECTION 1. It being declared by the Constitutional provision the policy of the State of Texas, Section 59, Article 16, to provide for the conservation and development of all the natural resources of the State, including the control, storing, preservation, and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power, and all other useful purposes, the reclamation and irrigation of its arid, semi-arid, and other lands needing irrigation, the reclamation and drainage of its overflowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State, are each and all hereby declared public rights and duties, which may be effected through the creation within the State, or the divisions of the State, into such number of conservation and reclamation districts as many be determined to be essential to the accomplishment of the purposes of the policy expressed in the Constitution of the State; such Districts to be governmental agencies and bodies politic and corporate, with all rights, privileges, and functions as may be conferred by law, there is hereby created the San Jacinto River Conservation District [now the San Jacinto River Authority][1].

SEC. 1A. (a) The District is subject to review under Chapter 325, Government Code (Texas Sunset Act), but may not be abolished under that chapter. The review shall be conducted under Section 325.025, Government Code, as if the District were a state agency scheduled to be abolished September 1, 2021, and every 12th year after that year.

(b) The District shall pay the cost incurred by the Sunset Advisory Commission in performing the review. The Sunset Advisory Commission shall determine the cost, and the District shall pay the amount promptly on receipt of a statement from the Sunset Advisory Commission detailing the cost.

SEC. 2. The San Jacinto River Conservation and Reclamation District is created as a governmental agency, a body politic and corporate, vested with all the authority as such under the

---

[1] See Acts of 1951, 52nd Leg., ch. 366, § 1; any usage hereinafter of the term "San Jacinto River Conservation and Reclamation District" shall mean the "San Jacinto River Authority" and vice versa.

20-20447.1748

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

Constitution and laws of the State; and shall have and be recognized to exercise all of the powers of such governmental agency and body politic and corporate as expressly authorized in the provisions of the Constitution, Section 59 of Article 16, for Districts created to conserve, control, and utilize to beneficial service the storm and flood waters of rivers and streams of the State, or such powers as may be contemplated and implied by the purposes of this provision of the Constitution, and as may be conferred by General Law, and in the provisions of this Act; and shall have and be recognized to exercise all the rights and powers of an independent governmental agency, body politic and corporate, to formulate any and all plans deemed essential to the operation of the District[2] and for its administration in the control, storing, preservation, and distribution to all useful purposes of the storm and flood waters of the San Jacinto River and its tributary streams; and as such District, shall have and be recognized to exercise such authority and power of control and regulation over such storm and flood waters of the San Jacinto River and its tributaries as may be exercised by the State of Texas, subject to the provisions of the Constitution and the Acts of the Legislature.

SEC. 3. The San Jacinto River Authority, in addition to all powers expressly or impliedly granted by other Sections of this Act, by complying where applicable with the provisions of Chapter 1, Title 128, Vernon's Texas Civil Statutes, as amended, is hereby empowered as follows:

(i) to store, control and conserve the storm and flood waters of the watershed of the San Jacinto River and its tributaries, and to prevent the escape of any such waters through every practical means; so as to prevent the devastation of lands from recurrent overflows, and to protect life and property;

(ii) to provide through every practical means for the control, utilization and coordination of regulation of the waters of the san Jacinto River and its tributaries;

---

[2] See Acts of 1951, 52nd Leg., ch. 366, § 2; any usage hereinafter of the term "District" shall mean the "Authority" and vice versa.

20-20447.1749

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

(iii)   to appropriate the waters of the San Jacinto River and its tributaries, to construct dams and other facilities for the impoundment, conservation, diversion and utilization of such waters, and to devote such waters to municipal, domestic, agricultural, commercial, industrial, mining, and other beneficial uses, within and without the watershed of said River;

(iv)   to provide waters for the irrigation of lands where irrigation is required for agricultural purposes or may be deemed helpful to more profitable agricultural production;

(v)   to provide water for domestic, municipal, commercial, industrial and mining purposes within and without the watershed of said River, including water supplies for cities, towns and industries, and in connection therewith to construct or otherwise acquire water transportation, treatment and distribution facilities and supplemental sources of supply;

(vi)   to encourage and develop drainage systems and provisions for drainage of lands in the valleys of the San Jacinto River and its tributary streams needing drainage for profitable agricultural production; and drainage for other lands in the watershed area of the Authority requiring drainage for the most advantageous use;

(vii)  to encourage through practical and legal means the conservation of soils against destructive erosion and thereby preventing the increased flood menace incident thereto;

(viii) to forest and reforest and to aid in the foresting and reforesting of the watershed area of the San Jacinto River and its tributaries and to prevent and aid in the prevention of soil erosion and floods in, on, and upon all lands situated within the boundaries of said Authority;

(ix)   to control, store, and employ the waters of the San Jacinto River and its tributaries in the development and distribution of hydroelectric powers, where such use may be economically coordinated with other and superior uses, and subordinated to the uses declared by law to be superior;

(x)   to encourage, aid, and protect navigation and harbor improvements;

(xi)   to acquire land adjacent to or in the vicinity of any waters impounded by the Authority or adjacent to or in the vicinity of San Jacinto River or any of its tributaries for park and recreation purposes and to acquire or construct park and recreation facilities thereon.  Except

20-20447.1750

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

as may otherwise be provided by the general law, the acquisition or construction any recreation and park facilities by the Authority shall be subject to the approval of the Texas State Parks and Wildlife Commission and to such conditions as the Commission may prescribe;

(xii) to acquire or construct facilities for the gathering, transporting, treating and disposing of sewage and industrial waste and effluent;

(xiii) to control, store and employ all or any of such waters for each and every purpose for which the same when controlled and conserved may be utilized in the performance of a useful service and contemplated and authorized by the provisions of the Constitution and the public policy therein declared;

(xiv) to construct and otherwise acquire and to repair, improve, extend, operate and maintain all works, plants and other facilities necessary or useful in the furtherance of any power granted by law to the Authority, including, but not limited to, water storage reservoirs, dams, canals, waterways, and water transportation facilities of all kinds, water treatment facilities, hydroelectric facilities, municipal water supply facilities, facilities for the treatment of sewage and industrial waste and effluent, parks and recreation facilities, and all other necessary and useful structures, facilities and equipment;

(xv) to enter into any and all necessary and proper contracts with other Federal or State agencies, districts and bodies politic and corporate, and others, to make and enter into such cooperative and coordinative contracts with such agencies, districts and bodies politic and corporate, and others, necessary or useful in the furtherance of any power granted by law to the Authority, including the power to pledge its funds and its other assets or any part thereof;

(xvi) to acquire any properties necessary for any of its corporate purposes by purchase, by condemnation as elsewhere provided in this Act, or by gift, and to acquire property by lease or other contract, upon such terms as may be accepted by the Authority's Board of Directors;

(xvii) to operate the water and sewage properties and facilities of other public bodies or political subdivisions upon such terms as the Authority may agree in connection with the

20-20447.1751

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

supplying by the Authority of any water or sewage or waste disposal or other services to public bodies;

(xviii)  to enter into such contracts, upon such terms and for such periods of time as the Board of the Authority might approve, with municipalities or other corporate bodies or persons, public or private, for the purpose of establishing and collecting, and by resolution or order of otherwise establish and collect, rates and other charges for the sale or use of water, water transmission, treatment or connection facilities, sewage or industrial or other waste disposal services and facilities of all types, park or recreation facilities, power, electric energy, and any other services sold, furnished, or supplied by the Authority, which fees and charges shall be sufficient to produce revenue adequate—

(1)   to pay expenses necessary to the operation and maintenance of the properties and facilities of the Authority;

(2)   to pay the interest on or the principal of any bonds or other obligations issued by the Authority when and as same become due and payable and to fulfill any reserve or other fund obligations of the Authority in connection with such bonds; and

(3)   to pay such other expenses as the Board of Directors shall deem necessary and proper for any purposes in the corporate operations, and functions of the Authority; and

(xix) to authorize by its contracts any other districts, agencies, and bodies politic and corporate and individuals to participate in the joint construction, operation, and maintenance of all of said water storage reservoirs, dams, canals, waterways, and water lines and all other structure, facilities, and equipment in connection therewith, or in connection with sewage or waste facilities of all types, and all necessary facilities for the manufacture, sale, and transportation of such hydroelectric power, along with said Authority, and said Authority may by such contracts allow such other agencies, districts, and bodies politic and corporate, and others to receive such portion of the revenues derived from the sale of water and hydroelectric power or furnishing sewage and waste facilities and services, as the Board of Directors shall deem just, equitable, and proper.

20-20447.1752

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

SEC. 4.  The powers and duties herein developed upon the San Jacinto River Authority are recognized to be taken subject to all legislative declarations of public policy in the maximum utilization of the storm, flood and unappropriated flow waters of the State for the purpose for which the Authority is created, as expressed and indicated in this Act, as amended, and subject to the  continuing rights of supervision by the State which shall be exercised through the Texas Water Rights Commission, which agency shall be charged with the authority and duty to approve, or to refuse to approve, the adequacy of any plan or plans (devised in the exercise of any power granted under this Act) which contemplate improvements or facilities, the plans pertaining to which are required to be supervised or approved by said agency under the provisions of the General Law.  If any such plans contemplate the installation, construction or other acquisition of parks and recreation facilities or of facilities for the gathering, transporting or disposal of sewage, or industrial wastes and effluent, said Commission shall not approve such plans until it finds that the Texas Parks and Wildlife Commission or the Texas Water Pollution Control Board, as the case may be, has issued such approvals or permits relating to such matters as may be required by this Act or the General Law.

SEC. 5.  The area of said District is hereby established to comprise all the territory embraced within the watershed of the San Jacinto River and its tributary streams, save and except that portion of said watershed lying and being situated within the boundaries of Harris County, which is hereby expressly excepted from the boundaries of said District.  Provided, that prior to September 1, 1941, the actual boundaries of said District shall be established by the Reclamation Department of the General Land Office, so that the same may be expressed in written calls of the metes and bounds of said District.  The written description of said boundaries shall be certified by the Commissioner of the General Land Office, approved by the State Board of Water Engineers, and recorded in the minutes of said District.  The Board of Directors shall cause a certified copy of said certified boundaries to be filed and recorded in the office of the County Clerk of each county lying in whole or in part within the boundaries of said District, and it shall also file a copy

20-20447.1753

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

thereof, together with a map showing said boundaries with the Tax Assessor and Collector of each of the counties lying in whole or in part within said District.

SEC. 6.   The management and control of all the affairs of said District shall be vested in, and the powers, rights, privileges, and functions of the District shall be exercised by, a Board of Directors consisting of six (6) members,[3] all of whom shall be freehold property taxpayers and legal voters of the State of Texas and four (4) of whom shall be residents of a county wholly encompassed by the District.  Members of such Board of Directors shall be appointed by the Governor for terms of six (6) years.  Provided, the present Board of six (6) directors of said District, appointed by the State Board of Water Engineers under authority of House Bill No. 1094, Chapter 613, Acts of the Regular Session of the Forty-seventh Legislature, amending Section 6 of Chapter 426, Acts of the Regular Session of the Forty-fifth Legislature, as amended by House Bill No. 828, Chapter 480, Acts of the Regular Session of the Forty-seventh Legislature, for terms of two (2), four (4), and six (6) years, shall continue to serve as such until the expiration of the respective terms for which they were appointed.  Upon the expiration of the respective terms for which the present members of the Board of Directors were appointed, the successors of each and all of them shall be appointed by the Governor for a term of six (6) years.

The directors shall hold office after their appointment and qualification until their successors shall be appointed and qualified.  Should any vacancy occur in the Board of Directors, the same shall be filled in like manner by the Governor for the unexpired term.  The Directors appointed shall, within the (30) days after their appointment, qualify by taking the official oath required of County Commissions, and shall execute bond in the sum of Five Thousand Dollars ($5,000) payable to the District, the sufficiency of which bond shall be determined by the State Board of Water Engineers, which bonds after being recorded in the official bond records of the county in which the District maintains its office shall be deposited with the depository selected and approved for the deposit of the funds of the District.

[3] See Sec. 651.0085, Tex. Gov't Code, as amended (requiring governor to appoint additional member).

20-20447.1754

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

The Board of Directors shall organize by electing one of its members President, one Vice-President, one Secretary, and one Treasurer. Four (4) members, including the presiding officer, shall constitute a quorum to transact business. The President shall preside at all meetings of the Board and shall be the chief executive officer of the District. The Vice-President shall act as President in case of the absence or disability of the President. The Secretary shall act as Secretary of the Board and shall be charged with the duty of keeping a record of all proceedings and all orders of the Board. The Treasurer shall receive and receipt for all moneys received by the District and shall keep books and records of all moneys received and expended. In case of the absence of inability of the Secretary to act, a Secretary pro term shall be selected by the directors.

The domicile of the District shall be in the City of Conroe, in the County of Montgomery, Texas, where the District shall maintain its principal office. The Board of Directors shall have authority to fix the time, place and number of meetings of such Board by proper resolutions, regulations and bylaws passed by said Board. Said Board shall cause to be kept complete and accurate accounts conforming to approved methods of bookkeeping. Said accounts and all contracts, documents, and records of the District shall be kept at said principal office, and same shall be open to public inspection at all reasonable times.

SEC. 7. (a) The Board of Directors shall have all powers, both express and implied, to do and perform any and all acts for any on behalf of the Authority which are authorized by the Constitution and laws of the United States of America and the State of Texas for the purpose of the achievement of the plans and purposes intended in the creation of the Authority and in the exercise of all powers elsewhere herein granted to the Authority; and said Board of Directors shall have full and complete authority to do any and all acts necessary or convenient to the exercise of the powers, privileges, and functions conferred upon said Authority and its Board of Directors by this Act or any other Act or law.

(b) The Board of Directors is hereby authorized and directed to make or cause to be made surveys and engineering investigations for the information of the Authority and to determine the plans necessary to the accomplishment of the purposes for which the Authority is

legislation-chronological redline (2018).doc 8

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

created, and may employ engineers, attorneys, and all other technical and non-technical assistants or employees and fix and provide the amount and manner of their compensation for the making of such surveys, the preparation of plans, and the collection of data essential to the determination of the character, extent, and cost of all improvements essential in the exercise of any power granted herein or in any other law applicable to the Authority, and for expenditures found essential in the maintenance and administration of the Authority.  The members of the Board of Directors shall receive a per diem of not more than Twenty-five ($25.00) Dollars per day for the period served, together with traveling and other necessary expenses.  Any director may perform any service required by the Board, but in such case may not receive the per diem and other compensation at the same time.

(c)   All bonds issued by the Authority shall be and are hereby declared to be legal and authorized investments for banks, savings banks, trust companies, building and loan associations, insurance companies, fiduciaries and trustees, and for any sinking funds of cities, towns, villages, counties, school districts and other political corporations and subdivisions of the State of Texas. Such bonds shall be eligible to secure the deposit of any and all public funds of the State of Texas and any and all public funds of cities, towns, villages, counties, school districts and other political corporations or sub-divisions of the State of Texas, and such bonds shall be lawful and sufficient security for said deposits at their market value when accompanied by all unmatured coupons appurtenant thereto.

(d)   Money in any fund of the Authority or any fund established by the Board of Directors in connection with the authorization of its bonds, including but not limited to proceeds from the sale of bonds, and which funds are not needed to satisfy their particular purpose for any period of time may be invested or reinvested from time to time in direct obligations of or obligations the principal and interest of which are guaranteed by the United States of America or invested in direct obligations of or participation certificates guaranteed by the Federal Intermediate Credit Banks, Federal Land Banks, Federal National Mortgage Association, Federal Home Loan Banks, Banks for Cooperatives, and in certificates of deposit of any bank or trust

20-20447.1756

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

company the deposits of which are fully secured by a pledge of securities of any of the kind hereinabove specified. The type and maturity of investments made hereunder shall be determined by the Board which, in the case of funds established in connection with the authorization of bonds, shall provide appropriate recitals with regard thereto in the resolutions relating to the issuance of such bonds. Income and profits on such investments shall be applied as provided in any such resolution, and, absent such provision, shall be applied to the uses hereinabove specified for bond proceeds.

SEC. 8. For the purpose of providing funds requisite to procure necessary engineering surveys, the collection and compilation of data respecting regional and general conditions entering into and influencing the character and extent of the improvements necessary to the storage, control, conservation, and equitable distribution, to the greatest public advantage of such flood waters when stored and controlled, it is hereby provided that any county lying in whole or in part within the area of the temporary District, as herein defined, may contribute to the funds from year to year for such engineering surveys and the compilation of data essential to the progress of flood control improvement in such amount as may be deemed an equitable part of the cost of such surveys and the compilation of necessary information in the estimated relations of such expenditures to the contemplated and probable benefit to be secured to the respective counties from the accomplishment of the plans and purposes of the creation of the District, and for the provision of such fund may make the necessary collections through their respective general funds, or may appropriate the amount of the estimated equitable contribution of such costs, of developing essential engineering data from their general fund.

SEC. 8c. (a) The Board of Directors of the Authority may adopt and enforce rules to:

(1) preserve and protect the sanitary condition and prevent waste or unauthorized use of water owned or controlled by the Authority;

(2) preserve, protect, secure, and regulate privileges on any Authority property; and

(3) ensure the public safety on, in, under, across, or within any Authority property.

20-20447.1757

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

(b)     A rule adopted under this section must clearly define any conduct that constitutes an offense and plainly state the punishment for the offense.  In adopting a rule under this section, the Board must prescribe a punishment that is proportionate to the seriousness of the offense.  The Board may designate an offense only as a Class C misdemeanor.

(c)     A rule adopted under this section does not take effect until the Authority has published once a week for two consecutive weeks a substantive statement of the rule and the penalty for violation of the rule in a newspaper with general circulation in each county in which the rule is to be effective.  The statement must intelligently explain the purpose to be accomplished by or the acts prohibited by the rule.  The statement must advise the public that violation of the rule will subject the violator to a penalty.  The statement must advise the public that the full text of the rule is on file in the principal office of the Authority and that any interested person is entitled to read the full text.  The Board may use one statement to satisfy the notice requirements of this section for any number of rules the Board adopts.  The Board may amend a rule after the rule is adopted, but must meet the notice requirements under this subsection.

(d)     The violation of a rule is not punishable as an offense unless the violation occurs after the 30th day on which the notice requirements under this section are met.  A rule adopted under this section is effective until repealed, revoked, rescinded, or amended by official action of the Board.

(e)     A rule adopted under this section shall be recognized by the courts of the state and is enforceable by complaint filed in the appropriate court by the proper prosecuting authority in a jurisdiction in which Authority property is located in the same manner as a penal statute under state law.  A penalty provided by a rule under this section is in addition to any other penalty provided by lay.  Rules promulgated under the authority of this chapter shall not conflict with any provision of the Parks and Wildlife Code or a rule adopted under the authority of the Parks and Wildlife Code.

20-20447.1758

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

(f)     The Board, the commissioners court, and the law enforcement officials in a county in which Authority property is located may enter into a contract to provide for the employment, assignment, duties, equipping, or compensation of local law enforcement personnel to enforce the Board's rules.   A contract under this subsection may require the Authority to pay the commissioners court a specified portion of the cost of providing the law enforcement personnel.

(g)     In this section, "Authority property" means any land, easement, water, property, equipment, work, or facility owned or controlled, in whole or in part, by the Authority, including a reservoir, impoundment, lake, canal, channel, conduit, pipe, siphon, dam, dike, levee, embankment, or berm, but excluding Lake Houston and the San Jacinto River below Lake Houston, except for equipment, works or facilities owned by the Authority at or near a dam site.

SEC. 9.  The San Jacinto River Conservation and Reclamation District is hereby declared to be a Conservation and Reclamation District, having all and singular, the powers, duties, functions, and to observe procedures in so far as the same may be applicable and practicable, to accomplish the purposes of this Act, as is provided by Chapter 25 of the General Laws of the Thirty-ninth Legislature, Regular Session, and the several amendments thereof; provided however, that the provisions of said Chapter 25, and the subsequent Amendments thereto, shall not apply to any matter specifically provided for herein, or expressly or impliedly excluded, relating to the creation of a district and to the issuance of preliminary bonds to finance the making of investigations upon which to base a plan for improvements and the levy of a tax therefore.  It is however, provided that the District may upon a vote of the qualified electors issue such preliminary bonds and levy a tax to retire the same, which tax may be in addition to all other taxes hereby authorized; Section 15 of Chapter 280, General and Special Laws of the Forty-first Legislature of Texas, Regular Session, amending said Chapter 25, General Laws of the Thirty-ninth Legislature, Regular Session, and Section 6 of Chapter 107 of the General and Special Laws of the Fortieth Legislature, First Called Session, amending said Chapter 25, shall not control this District, but in lieu thereof it is specifically provided as follows:

20-20447.1759

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

(a)     After the completion and approval of a plan for the coordination of improvements deemed adequate to serve said watershed as a whole, as hereinbefore provided for, the State Board of Water Engineers and the Reclamation Department of the General Land Office of Texas in authorizing improvements to control the waters of, and, or in allocating the right to use waters from said San Jacinto River and its tributaries shall substantially conform to, and shall effectually preserve the benefits of, the plan formulated by this District, and said District shall have the right to enforce the observance of the same by judicial decree.

(b)     This District shall have the power to provide and maintain improvements for the common benefit of said District as a whole, subject only in appropriate case to the constitutional and statutory provisions concerning a vote by the qualified electors of the District.

(c)     Especially shall said District have all and singular the powers contained in Section 15 of said Chapter 280, General and Special Laws of the Forty-first Legislature, relating to improvements peculiar to defined areas within a district.

(d)     It is however, further provided that if the electors of any defined area within this District desire they may become a water control and improvement district for the purpose of independently providing, operating, and maintaining improvements designed peculiarly to serve such defined area.   Such contained defined area may be so constituted under the applicable provisions of said Chapter 25 of the General Laws of the Regular Session of the Thirty-ninth Legislature.   In like manner any other political subdivision of the State of Texas being in whole or in part in this District may independently provide, maintain, and operate works peculiarly designed to benefit such body politic.   In either case, however, such works and the operation thereof shall be constructed and operated in such manner as will conform to this District plan to the greatest practicable degree.

(e)     To the extent necessary to enable this District to construct, maintain, and operate works beneficial to the District as a whole, or to give the supervision, or to perform any service inuring to the benefit of the District as a whole and provide funds adequate to defray the cost of the administration to this District, it shall have power to levy and collect taxes, equitably

20-20447.1760

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

distributed, which taxes shall be in addition to other taxes that may lawfully be levied by the State and other political subdivisions thereof.

(f)     This Legislature finds and declares that the recurrent, devastating floods in the valley of the San Jacinto River, which have, over a long period of years, caused a deplorable loss of life and property, and the erosion of soil, and a depletion of the fertility of the lands in said valley and watershed served by the San Jacinto River in Texas, and the public highways and structures on land belonging to the State of Texas situated within said watershed, to be a public calamity, and the San Jacinto River Conservation and Reclamation District is hereby authorized to do any and all things necessary or suitable for the prevention of such public calamity.

SEC. 10.   The San Jacinto River Conservation and Reclamation District shall not be authorized to issue bonds nor to incur any form of continuing obligations or indebtedness for purposes of effecting improvements comprehended in the plan of organization and administration of the District, nor incur any indebtedness in the form of a continuing charge upon land or properties within the District, unless such proposition shall have been submitted to the qualified property taxpaying voters of the District, or, in appropriate case, such voters of a defined area or political subdivision within the District, and approved by a majority of such electors voting thereon.

SEC. 10a.   The Board of Directors of the San Jacinto River Conservation and Reclamation District, a State Agency, shall have full authority to negotiate and deal and/or contract with the United States of America or with any of its governmental agencies now in existence or that may hereafter come into existence and/or others for grants, and/or loans and/or allotments and is hereby granted the right and power to receive and accept grants and/or loans and/or allotments from the United States of America and/or others for the purpose of making investigations and assembling data and/or for any one or more purposes set forth in this Act and/or the Act creating the San Jacinto Conservation and Reclamation District and to receive and use said moneys for the purpose mentioned in said Acts.

20-20447.1761

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

SEC. 10b.  The Authority shall have the authority and is hereby authorized to issue from time to time its negotiable revenue bonds for the purpose of making investigations and assembling data; for the purpose or purposes of purchasing, acquiring, and/or condemning lands, leases, easements, rights-of-way and other properties; and for the purpose of constructing, repairing, improving and extending any structures, dams, reservoirs, transmission facilities, water treatment, water supply, sewage and other waste gathering, transmission, treatment and disposal facilities, for developing park and recreation facilities; and for the purposes of acquiring, constructing, improving, repairing and extending any other properties and facilities deemed appropriate by the Board of Directors of the Authority in the exercise of powers granted the Authority in Section 3 or elsewhere in this Act.  Any one or more or a combination of the foregoing purposes may be combined into a single issue of bonds.  Such bonds shall be issued in accordance with, and may be secured by and payable from any or all the revenues of the Authority permitted by, Section 10c hereof, including, but not limited to, the proceeds of any one or more contracts between the Authority and any persons, firms, corporations, cities and political subdivisions.

If and when the Legislature remits the ad valorem tax in the counties for a certain period of years, the Directors may in their discretion if necessary with the approval of the Commissioners Court of the county in the watershed use part or all of the taxes remitted to said counties for the purpose of paying back to the United States of America or any of its agencies or others the money borrowed by the Authority for the purpose herein mentioned.

SEC. 10c.  The bonds issued by the authority of this Act may either be (1) sold for cash, at public or private sale, at such price or prices as the Board of Directors shall determine, not to be for less than par and accrued interest, provided that the interest cost of the money received therefore, computed to maturity in accordance with the standard bonds tables in general use by banks and insurance companies, shall not exceed five (5) per cent per annum, or (2) may be issued on such terms as the Board of Directors shall deem necessary or convenient for any corporate purpose, or (3) may be issued to refund any bonds issued at any time under authority of

20-20447.1762

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

this Act.  All such bonds shall be authorized by resolution or resolutions of the Board of Directors concurred in by a majority of the members of the Board, and shall bear such date or dates, made at such time or times, bear interest at such rate or rates (not exceeding five (5) per cent per annum) payable annually or semiannually, that such denominations be in such form, either coupon or registered, carrying such registered privileges as to principal only or as to both principal and interest, and as to exchange of coupon bonds for registered bonds or vice versa, in exchange of bonds of one denomination for bonds of other denominations, be executed in such manner and be payable at such place or places within or without the State of Texas, as such resolution or resolutions may provide.  Any resolution or resolutions authorizing any bonds may contain provisions, which shall be part of the contract between the directors and the bondholders thereof from time to time.

(a)　Reserving the right to redeem such bonds at such time or times, in such amounts and at such prices not exceeding one hundred and two (102) per cent of the principal amount thereof, plus accrued interest, as may be provided;

(b)　Providing for the setting aside of sinking funds or reserve funds and the regulation and disposition thereof;

(c)　Pledging to secure the payment of the principal and interest on such bonds and the sinking fund or reserve fund payments agreed to be made in respect to such bonds all or any parts of the moneys that may be donated and/or granted herein by the State of Texas and all or any part of the gross or net revenues hereafter received by the district in respect of the property, real, personal, or mixed, to be acquired and/or constructed with such bonds or with proceeds thereof, or all or any part of the gross or net revenues thereafter received by the District from whatsoever source derived;

(d)　Prescribing the purposes to which such bonds or any bonds thereafter to be issued or the proceeds thereof, may be applied;

20-20447.1763

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

(e)     Agreeing to fix and collect rates and charges sufficient to produce revenues together with the moneys that may be granted and/or donated by the State of Texas adequate to pay the items specified herein, and prescribing the use and disposition of all revenues;

(f)     Prescribing limitations upon the issuance of additional bonds and upon all agreements which may be made with the purchaser and successive bondholders;

(g)     With regard to the construction, extension, improvement, operation, maintenance, depreciation, replacement, and betterments of the properties of the District and carrying of insurance upon all or any part of said property covering loss or damage or loss of use and occupance resulting from specified risks;

(h)     Fixing the procedure, if any, by which, if the District shall so desire, the terms of any contract with bondholders of such bonds may be amended or abrogated, the amount of bonds the holders of such must consent thereto, and the manner in which such consent shall be evidenced, for the execution and delivery by the district to the bank or trust company authorized by law to accept such trust, or to the United States of America or any office or agency thereof, of indentures or agreements therein authorized to be made with all for the benefit of the holders of such bonds and such other provisions as may be contained in such indentures or agreements; and

(i)     Such other provisions not inconsistent with provisions of this Act as the Board may approve.

Any such resolution and any indenture or agreement entered into pursuant thereto may provide that in the event that,

(1a)   Defaults may be made in the payment of the interest on any or all bonds when and as the same shall become due and payable, or

(1b)   Defaults shall be made in payment of the principal of any or all bonds when and as the same shall become due and payable whether at maturity thereof, by call for redemption or otherwise, or

(1c)   Defaults shall be made in the performance in agreement made with purchasers or successive holders of any bonds, and such defaults shall have continued for such period, if any, as

20-20447.1764

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

may be prescribed by said resolution in respect thereof, the trustee under the indenture or indentures entered into in respect of the bonds authorized, and by, or, if there shall be in such indenture, a trustee appointed in the manner provided in such resolution or resolutions by the bondholders of twenty-five (25) per cent aggregate principal amount of the bonds authorized hereby and at the time outstanding may, and upon the written request of the holders of twenty-five (25) percent in aggregate principal amount of the bonds authorized by such resolution or resolutions at the time outstanding, shall, in his or its own name, be for the equal and proportionate benefit of the holders of all such bonds; and with or without having possession thereof for the holders of all such bonds:

(1)     By mandamus or suit, action or proceeding at law or in equity, enforce all rights of the holders of such bonds,

(2)     Bring suit upon such bonds and/or appurtenant coupons,

(3)     By action or suit in equity requiring the Directors to act as if they were the trustees of an express trust for the bondholders,

(4)     By action or suit in equity enjoin any act or things which may be unlawful or in violation of the rights of the holders of such bonds, and/or

(5)     After such notice of the Directors as such resolution may provide, declare the principal of all such bonds due and payable and if all defaults shall be made good, then with the written consent of the holders of twenty-five (25) per cent aggregate principal amount of such bonds at the time outstanding, annul such declaration and its consequent; provided, however, that the bondholders of more than the majority and principal amounts of bonds authorized thereby and at the time outstanding shall by instrument or instruments in writing delivered to such trustee, have the right to direct and control any and all actions taken or to be taken by such trustee under this paragraph.  Such resolution, indenture or agreement may provide that in any such suit, action or proceeding, any such trustee, whether or not all of such bonds shall have been declared due and payable, and with or without possession of any thereof, shall be entitled as of right to the appointment of a receiver who may enter and take possession of all or any part of the properties

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

of the District, and operate and maintain the same, and fix, collect and receive rates and charges that together with the moneys that may be granted and/or donated by the State of Texas will be sufficient to provide revenues adequate to pay the items set forth herein, and cost and disbursements of such suit, action or proceeding, and to apply such revenue in conformity with the provisions of this Act and the resolution or resolutions authorizing such bonds.  In any suit, action or proceeding by any such trustee or receivers, if any, counsel fees and expenses of such trustee and of receiver or receivers, if any, shall constitute taxable disbursements and all costs and disbursements allowed by the Court shall be a fixed charge upon any revenue pledged to secure the payment of such bonds.  In addition to the powers hereinabove specifically provided for, each trustee shall have possess all powers necessary or appropriate for the exercise of any thereof, or incident to the general representation of the bondholders in enforcement of their rights.

Before any bonds shall be sold by the District, a certified copy of the proceedings for the issuance thereof, including the term of such bonds, together with any other information which the Attorney General of the State of Texas may require, shall be submitted to the Attorney General, and if he shall find that such bonds have been issued in accordance with law, and he shall approve such bonds, he shall execute a certificate to that effect which shall be filed in the office of the Comptroller of the State of Texas and be recorded in a record kept for that purpose.  No bonds shall be issued until the same shall have been registered by the Comptroller who shall so register the same if the Attorney General shall have filed with the Comptroller his certificate approving the bonds and the proceedings for the issuance thereof as hereinabove provided.

All bonds approved by the Attorney General as aforesaid, and registered by the Comptroller as aforesaid, and issued in accordance with proceedings so approved shall be valid and binding obligations of the District and shall be incontestable for any cause from and after the time of such registration.

SEC. 10d.  The Authority shall be authorized to enter into oil and gas leases with respect to its properties upon such terms as the Board of Directors may consider appropriate in the production of revenues to the Authority.  The Authority shall be additionally authorized to sell or

20-20447.1766

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

otherwise dispose of its properties if its Board of Directors shall have first determined that the property or interest to be disposed of is not necessary to the business of the Authority and shall have approved the terms of any such sale.  All property of the Authority, however, shall be at all times exempted from forced sale under any judgment, suite or proceeding of any nature or kind.

SEC. 10e.  The District shall have the power and is hereby authorized to acquire by purchase, lease, gift, or in any other manner (otherwise than by condemnation) and to maintain, use and operate any and all property of any kind, real, personal, or mixed, or any interest therein, within or without the boundaries of the District necessary or convenient to the exercise of the powers, rights, privileges, and functions conferred upon it by this Act.

The District shall have the power and right of eminent domain for the purpose of acquiring by condemnation any and all property of any kind, real, personal, or mixed, or any interest therein, within or without the boundaries of the District (other than such property of or any interest therein without the boundaries of the District as may at the time be owned by any body politic) necessary or convenient to the exercise of the powers, rights, privileges, and functions conferred upon it by this Act in the manner provided by General Law with respect to condemnation, or at the option of the District, in the manner provided by Statutes relative to condemnation by Districts organized under General Law pursuant to Section 59 of Article 16 of the Constitution of the State of Texas.

In condemnation proceedings, being prosecuted by said Districts, the District shall not be required to give bond for appeal or bond for costs.

That if in the exercise of the power of eminent domain, the relocation or change of grade of any railroad facilities are required, the same shall be accomplished under the provisions of Article 7880-123a, Revised Civil Statutes of Texas, 1925.

The District shall have the power and authority to overflow, and inundate any public lands and public property and to require the relocation of roads and highways in the manner and to the extend permitted to Districts organized under General Law pursuant to Section 59 of Article 16 of Constitution of the State of Texas

20-20447.1767

*Current Through:*
*Acts 1937, 45th R.S., ch. 426*
*Acts 1939, 46th R.S., ch. 10*
*Acts 1941, 47th R.S., ch. 480 & 613*
*Acts 1943, 48th R.S., ch. 371*
*Acts 1951, 52nd R.S., ch. 366 & 367*
*Acts 1967, 60th R.S., ch. 547*
*Acts 1991, 72nd R.S., ch. 698*
*Acts 2003, 78th R.S., ch. 847*
*Acts 2015, 84th R.S., ch. 1148*

SEC. 10f.  The Board of Directors shall have authority to make all necessary rules and regulations for the government and control of the District not inconsistent with the Constitution and Laws of the State of Texas.

SEC. 12.  In the prosecution of the plans for which the District has been created for the storing, controlling, conserving, and distributing to useful purposes the storm and flood waters of the San Jacinto River watershed, the District shall be recognized to have the right to make use of the bed and banks of the San Jacinto River and of its tributary streams for any and all purposes necessary to the accomplishments of the plans of the District.

SEC. 13.  Nothing in this Act, as amended, shall be construed to violate an provision of the Federal or State Constitution, and all acts done under this Act shall be in such manner as will confirm thereto, whether expressly provided or not.  Where any procedure hereunder may be held by any court to be violative of either of such Constitutions, the Authority shall have the power by resolution to provide an alternative procedure conformable with such Constitutions.  If any provision of this Act should be invalid, such fact shall not affect the validity of any other provisions of this Act, and the Legislature hereby declares that it would have enacted the valid provisions of the Act notwithstanding the invalidity of any other provision or provisions hereof.

SEC. 14.  [OMITTED].

20-20447.1768